**No. 2025-2106**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

PLR WORLDWIDE SALES LTD.,

*Appellant*,

v.

FLIP PHONE GAMES, INC.,

*Appellee*.

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2024-00209*

# BRIEF FOR APPELLANT

Dated: April 13, 2026
Corrected: April 27, 2026

James M. Glass
Ron Hagiz
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
jimglass@quinnemanuel.com
ronhagiz@quinnemanuel.com

Todd M. Briggs
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5020
toddbriggs@quinnemanuel.com

Rachael L. McCracken
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000
rachaelmccracken@quinnemanuel.com

Quincy Lu
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000
quincylu@quinnemanuel.com

## PATENT CLAIMS AT ISSUE

Claim 12 of U.S. Patent No. 9,427,662 (“the ’662 patent”) depends from claim 1 (not at issue in this appeal), which recites:

> 1. A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:
>
> > a) contacting a server for hot spot information to download, comprising providing the server with at least one of: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, a version identifier for hot spot information currently on the mobile communication device, user-identification information, preset location, amount of game-play time, game score, and level of play;
> >
> > b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:
> >
> > > 1) hidden content for presenting to the user when the hot spot is activated; and
> > >
> > > 2) coordinate information;
> >
> > c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;
> >
> > d) displaying an object at the designated non-promotional location; and
> >
> > e) displaying the hidden content when the user activates the hot spot.

Claim 12 further recites:

> 12. The method of claim 1, wherein the hidden content comprises a second hot spot.

Claim 20 of the ’662 patent depends from claim 13 (not at issue in this appeal), which recites:

> 13. A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:
>
> a) contacting a server for hot spot information to download, comprising providing the server with user-identification information;
>
> b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:
>
> 1) hidden promotional content for presenting to the user when the hot spot is activated; and
>
> 2) coordinate information;
>
> c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;
>
> d) displaying an object at the designated non-promotional location; and
>
> e) displaying the hidden promotional content when the user activates the hot spot.

Claim 20 further recites:

> 20. The method of claim 13, wherein the hidden content comprises a second hot spot.

Appx68-69.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2106

**Short Case Caption** PLR Worldwide Sales Ltd. v. Flip Phone Games, Inc.

**Filing Party/Entity** PLR Worldwide Sales Ltd.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/13/2026

Signature: /s/ James M. Glass

Name: James M. Glass

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| PLR Worldwide Sales Ltd. | | Playrix Holdings Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Nima Hefazi, Quinn Emanuel Urquhart & Sullivan | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ........ I

STATEMENT OF RELATED CASES ........ VIII

PRELIMINARY STATEMENT ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES PRESENTED ........ 3

STATEMENT OF THE CASE ........ 3

A. Technology Background ........ 3

B. The ’662 Patent ........ 4

1. Specification ........ 4

2. The Only Issue on Appeal: Claims 12 and 20’s “Second Hot Spot” Included in the “Hidden Content” ........ 6

C. The Prior Art ........ 6

1. Jiau ........ 7

2. Aoki ........ 8

3. Kim ........ 8

D. Proceedings Before the Patent Trial and Appeal Board ........ 9

1. The Petition ........ 9

2. The Board’s Majority Decision ........ 11

3. The Dissent ........ 13

SUMMARY OF ARGUMENT ........ 14

STANDARD OF REVIEW ........ 16

ARGUMENT ........................................................................................ 16

I. THE COURT SHOULD REVERSE THE MAJORITY'S DETERMINATION THAT JIAU DOES NOT RENDER OBVIOUS THE ADDITIONAL LIMITATION OF CLAIMS 12 AND 20 .................. 16

A. The Majority Improperly Focused on Jiau's Express Disclosures ........................................................................ 16

B. Jiau Fairly Suggests That Hidden Content May Include Additional Hotspots ........................................................................ 22

C. Jiau Does Not Require Modification To Render Claims 12 And 20 Obvious ........................................................................ 26

II. THE COURT SHOULD REMAND TO THE BOARD FOR FURTHER FACTUAL FINDINGS REGARDING INDEPENDENT CLAIMS 1 AND 13 ........................................................................ 27

CONCLUSION ........................................................................ 27

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Baird*,
16 F.3d 380 (Fed. Cir. 1994) .......... 14

*Bradium Techs. LLC v. Iancu*,
923 F.3d 1032 (Fed. Cir. 2019) .......... 13, 14, 16

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 16

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) .......... 16

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .......... 21, 22, 23

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .......... 15

*MemoryWeb, LLC v. Samsung Elecs. Co., Ltd.*,
No. 2024-1322, 2025 WL 3687250 (Fed. Cir. Dec. 19, 2025) .......... 16

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) .......... 16

## Rules/Statutes

28 U.S.C. §1295(a)(4)(A) .......... 2

35 U.S.C. §§142 .......... 2

35 U.S.C. §§311-319 .......... 2

35 U.S.C. §141(c) .......... 2

35 U.S.C. §142 .......... 2

37 C.F.R. §90.3(a)(1) .......... 2

Fed. R. App. Proc. 4(a)(3).....................................................................................2

## STATEMENT OF RELATED CASES

There have been no prior appeals in this case. Appellee Flip Phone Games, Inc. originally appealed the Board's decision in IPR2024-00209 finding claims 1-11 and 13-19 of U.S. Patent No. 9,427,662 unpatentable. *See Flip Phone Games, Inc. v. PLR Worldwide Sales Limited*, No. 25-2058 (Fed. Cir.). That appeal was voluntarily dismissed on February 18, 2026.

U.S. Patent No. 9,427,662 is also at issue in the pending case *Flip Phone Games, Inc. v. PLR Worldwide Sales Limited*, 2:23-cv-00139-JRG (E.D. Tex.).

## PRELIMINARY STATEMENT

Appellant PLR Worldwide Sales Ltd. ("Playrix") raises a single issue in this appeal: whether the majority of the Board erred in determining that dependent claims 12 and 20 of U.S. Pat. No. 9,427,662 (the "'662 patent") are not unpatentable over the Jiau prior art reference, WO 2000/070489 (Appx1104-1154). Both claims recite identical additional limitations: that "hidden content" associated with a first hot spot in the corresponding independent claims "comprises a second hot spot." Appx68-69 ('662). The Board separately determined that every other claim of the '662 patent—including the independent claims reciting a first hot spot and hidden content—are unpatentable over the prior art of record. Appx46 (FWD).

The majority's determination regarding claims 12 and 20 should be reversed because it failed to consider what Jiau fairly suggests to a Person of Ordinary Skill in the Art (POSITA). Instead, the majority improperly focused on Jiau's express disclosures, ultimately concluding that Jiau does not render obvious dependent claims 12 and 20 because it does not expressly describe hidden content of a first hotspot that includes a second hotspot.[1] As the dissent correctly recognized, however, when Jiau's teachings are considered in their entirety, Jiau fairly suggests

---

[1] The '662 patent uses the term "hot spot," while Jiau uses the term "hotspot." It is undisputed that both terms refer to the same feature, *i.e.*, a portion of an object in a game that triggers hidden content when activated. The remainder of this brief adopts Jiau's spelling except when referring directly to the claims and disclosures of the '662 patent.

that the hidden content associated with a first object and hotspot—for example, the interior of a building that is displayed when a user activates a door hotspot—may contain additional objects, each of which may have its own associated hotspot. Claims 12 and 20 require nothing more, and thus the majority erred in determining that those claims are not unpatentable over Jiau.

For these reasons and as further explained below, this Court should reverse the majority's decision as to the additional limitation of dependent claims 12 and 20 of the '662 patent.

## JURISDICTIONAL STATEMENT

This appeal arises from the IPR proceeding IPR2024-00209 under 35 U.S.C. §§311-319. The Board entered a final written decision on April 24, 2025. Appx1-52. Playrix and FPG both timely requested Director review of the Board's final written decision, which was denied on June 25, 2025. Appx619-653; Appx674-676. FPG subsequently filed a timely notice of appeal. Appx677-681; 35 U.S.C. §§142, 319; 37 C.F.R. §90.3(a)(1). Playrix filed a timely notice of cross-appeal. Appx734-738. 35 U.S.C. §§141(c), 142, 319; 37 C.F.R. §90.3(a)(1); Fed. R. App. Proc. 4(a)(3). FPG subsequently voluntarily dismissed its appeal. This Court has jurisdiction under 35 U.S.C. §319, 35 U.S.C. §141(c), and 28 U.S.C. §1295(a)(4)(A).

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the majority's determination that claims 12 and 20 of the '662 Patent are not unpatentable was legally correct and based on substantial evidence.

## STATEMENT OF THE CASE

### A. Technology Background

Video games in the form of coin-operated arcade machines and home video game consoles date back to the 1960s and 1970s and were widely popular by the 1980s. Appx929-930 (Zagal Dec.), ¶42; Appx1280; Appx1362; Appx1378-1404; Appx1533; Appx1558; Appx1667. Video games began appearing on mobile phones in the late 1990s, with the market growing as mobile phones began incorporating increasingly more powerful hardware. Appx931 (Zagal Dec.), ¶44; Appx1864; Appx1870; Appx1874. By the early 2000s, the mobile game market was rapidly growing, and hardware manufacturers and software developers quickly adapted to overcome challenges associated with mobile game development. Appx931-933 (Zagal Dec.), ¶¶45-47; Appx1878; Appx62 ('662), 1:15-18, 1:28-30.

Game developers embraced the idea of updateable games even before mobile games became popular. Appx933-934 (Zagal Dec.), ¶¶48-49. For example, in 2001, Nokia launched a subscription service that allowed members to download new levels for certain mobile games. *Id.*; Appx2021. Dynamic content updates also allowed advertisers to expand into video games, and by 2006 several advertising companies had launched in-game advertising networks that allowed game developers to

incorporate dynamic ads from third parties into mobile games. Appx934-935 (Zagal Dec.), ¶¶50-51; Appx1883-1884; Appx1915-1916; Appx1968; *see also generally* Appx1166-1211 (Sturman); Appx1212-1238 (Ellis). These in-game ads also included interactive ads, which required a user to interact with an in-game object in order to trigger advertising content. Appx1938.

### B. The '662 Patent

#### 1. Specification

The '662 Patent is directed to systems and methods that provide hot spots in a mobile game. Appx62 ('662), 1:11-13; Appx940-941 (Zagal Dec.), ¶¶62-65. The specification acknowledges that as of the priority date, "an extremely large number of people worldwide own[ed] mobile communication devices," and that those devices had experienced a "recent surge in technical capabilities." Appx62 ('662), 1:45-48. In addition, "[m]ost current mobile communication devices come equipped with one or more games" and "allow users to download and/or purchase new games." Appx62 ('662), 1:18-21. Thus, "gaming on mobile communication devices" was already "a popular mode of entertainment." Appx62 ('662), 1:28-30. Accordingly, the '662 Patent does not claim to have invented mobile devices or mobile games. Instead, the '662 Patent focuses on two concepts relating to the design of a mobile game: (1) how to "hold the user's interest for a longer period of

time," and (2) how to "provid[e] in-game advertising space in the palm of the user's hand." Appx62 ('662), 1:43-44, 1:53-54.

Specifically, the '662 Patent describes using "hot spots of triggered content within the gaming environment of a mobile video game." Appx62 ('662), 1:65-66. "A hot spot is an in-game feature that includes an activation element and a content element that is triggered by the activation element." Appx62 ('662), 2:25-26. "The activation element may comprise an area location or an item, sometimes hidden in the game, that can be triggered by a user or some other in-game element." Appx62 ('662), 2:31-33. The content element is "displayed when the hot spot is activated" and "may include … a message, and the message may be promotional." Appx62 ('662), 2:39-41.

For example, updates containing new hot spot information for a mobile game are distributed by a server. Appx63 ('662), 3:10-22. A mobile device running the mobile game contacts the server over an available network (*e.g.*, the Internet) and requests updated hot spot information. Appx66 ('662), 9:27-32. In response, the server determines which hot spot information (if any) should be sent to the mobile device, based on readily available information, such as the model type of the requesting device, the location of the mobile device, the telecommunications service plan or service provider of the mobile device, or other user information supplied to the server. Appx68 ('662), 13:37-46. Once the appropriate hot spot information has

been determined, the server uploads the hot spot information to the mobile device. Appx68 ('662), 14:8-9. The mobile device then incorporates the new hot spot information into the mobile game, for example, by designating an in-game location that activates the hot spot, and displaying the hot spot content when the hot spot is activated. Appx67 ('662), 11:52-12:42.

#### 2. The Only Issue on Appeal: Claims 12 and 20's "Second Hot Spot" Included in the "Hidden Content"

The only issue on appeal is the additional limitation of dependent claims 12 and 20, which both recite a "second hot spot" that is included in the "hidden content" of a first hot spot. The specification only discloses this embodiment in two brief examples that reference a second hot spot that becomes accessible when a first hot spot is triggered. Appx62 ('662), 2:45-46 ("The content triggered by a first hot spot can also include another hot spot that is then placed within the game."); Appx67 ('662), 12:22-24 ("[T]he activated content of a first hot spot may include placing a second hot spot in-game.").

### C. The Prior Art

Playrix presented several grounds based on different references in the Petition to the Board (challenging the validity of the '662 patent). Only two of the four grounds, based on Jiau and Aoki, and Jiau and Kim (respectively), challenged dependent claims 12 and 20, which are the subject of the instant proceeding. In both

grounds, Playrix relied only on Jiau's teachings as rendering obvious claims 12 and 20.

### 1. Jiau

Jiau relates to "virtual worlds," such as three-dimensional worlds that may be presented to a player as part of a video game. Appx1106 (Jiau), 1:7-21; Appx957-958 (Zagal Dec.), ¶¶91-94. Jiau explains that previous "three-dimensional games… involve[d] a predetermined, predefined virtual world that does not change," and is instead "defined by the game designer." Appx1106 (Jiau), 1:22-24. Jiau thus discloses a virtual world that is "divided into a plurality of 'lots'" that users "can reserve … to design as they please." Appx1106-1107 (Jiau), 1:32-2:2.

Each lot in Jiau's virtual world includes objects that are fetched from a server as the user moves through the virtual world. Appx1108 (Jiau), 3:18-21. The virtual world may also include "hotspots" that are "assign[ed] [to] a part of an existing object"; "when a user in the virtual world activates the hotspot," the game "perform[s] a hotspot activity in the virtual world associated with the activated hotspot." Appx1108 (Jiau), 3:22-26. The hotspot activity may be promotional in nature. "For example, when the user touches or selects an object, a pop-up advertisement may appear." Appx1121 (Jiau), 16:31-32.

### 2. Aoki

Aoki relates to a "game advertisement charge system" that includes game terminals connected over a communication network to an advertisement management server comprising an advertisement management database. Appx1082 (Aoki), Fig. 1; Appx1096-1097 (Aoki), [0060]-[0062]. "A game advertisement may be supplied from various advertisers in the form of a still picture, a motion picture, audio, character data (text data)" and "sent to a game terminal" via the communication network. Appx1097 (Aoki), [0067]. For example advertisements may be associated with and displayed on objects in the game, such as "placard objects" or "a building, a game character object, and a moving object." Appx1084 (Aoki), Fig. 3; Appx1097-1098 (Aoki), [0068].

### 3. Kim

Kim "relates to a method of advertisement which is applied to a game on the internet." Appx1161 (Kim), 1:14-17. Kim states that "passive banner advertisements" are not effective, and proposes solving this problem by allowing more "active" advertisements that are inserted in a game program. Appx1161 (Kim), 1:64-2:25. Kim's "advertisement item" is incorporated into a game program so that the character of the game can "find or pick it." Appx1164 (Kim), 8:46-52. For instance, Kim explains that a monster may appear at a "certain place and certain time" in the game. Appx1164 (Kim), 8:60-64. If a user's character encounters and

fights the monster, an "advertisement item relevant to the monster can be shown at the spot where the monster [] dies." Appx1164 (Kim), 8:49-52.

### D. Proceedings Before the Patent Trial and Appeal Board

#### 1. The Petition

In its Petition for *inter partes* review (Appx78-162), Playrix challenged all claims (1-20) of the '662 patent as unpatentable based on four grounds:

- Ground 1 (claims 1-11, 13-19) relied on Ho and Aoki;
- Ground 2 (claims 1-20) relied on Jiau and Aoki;
- Ground 3 (claims 1-11, 13-19) relied on Ho and Kim; and
- Ground 4 (claims 1-20) relied on Jiau and Kim.

Appx89 (Pet.).

With respect to dependent claims 12 and 20, the Petition argued that Jiau discloses and renders obvious "hidden content" that "comprises a second hot spot" based primarily on the examples illustrated in Figures 11(e) and 11(f) of Jiau, as well as Jiau's related disclosures about objects and hotspots generally. Appx141-142 (Pet.). For example, Figure 11(e) shows an "object 1192" (*e.g.*, a building) with a "hotspot link 1194 (e.g., a door-shape)" (the hotspot annotated in orange below). Appx1120 (Jiau), 15:18-31; Appx1147, Fig. 11(e) (annotated).




Fig. 11(e)

The user "activates the hotspot" by "collid[ing] with or pass[ing] sufficiently close to" it, which causes the user to "enter[] the interior of the object." Appx1120 (Jiau), 15:18-21. Once the user activates the hotspot and enters building 1192, Jiau displays previously hidden content by "render[ing] an interior view of the object" as shown in Figure 11(f). Appx1120 (Jiau), 15:21-24. As illustrated in Figure 11(f), the interior view of the object may itself contain other objects, such as furniture objects (annotated in green below).




Fig. 11(f)

Appx142 (Pet.); Appx1148 (Jiau), Fig. 11(f) (annotated).

The Petition cited testimony from Playrix's expert, Dr. José Zagal, who explained that a POSITA would have understood that the furniture in Fig. 11(f) may itself be or include hotspots because Jiau discloses that objects "may be associated with a plurality of hot spots," each of which is "activated separately" and may have "different hotspot activities associated therewith." Appx1005 (Zagal Dec.), ¶206 (quoting Appx1126-1127 (Jiau), claims 8-10).

### 2. The Board's Majority Decision

In its Final Written Decision, the Board found claims 1-11 and 13-19 unpatentable based on the Ho/Aoki ground presented in the petition. Appx36

(FWD). However, in a split decision, the majority found that Jiau does not render obvious claims 12 and 20.

The majority acknowledged that Jiau discloses hotspots as "areas of an object (or a whole object) that have an associated link" and trigger hidden content when activated, *e.g.*, "when the user touches or selects an object, a pop-up advertisement may appear." Appx39 (FWD) (quoting Appx1120-1121 (Jiau), 15:31-32, 16:31-32) (internal quotation marks omitted). The majority further acknowledged that Figure 11(e) of Jiau discloses "an object having a hotspot allowing a user to enter an interior of the object," which causes "the client computer [to] render[] an interior view of the object" shown in Figure 11(f). Appx39-41 (FWD) (citing Appx1120-21 (Jiau), 15:18-16:2). And the majority agreed that Jiau discloses that objects may have "a plurality of hotspots," each "activated separately" and associated with "different hotspot activities." Appx41 (FWD).

Nevertheless, the majority concluded that Jiau does not render obvious that hidden content of a first hot spot may include a second hot spot. First, the majority interpreted Jiau's disclosure of objects with a plurality of hotspots to mean only that objects may have multiple hotspots on their surface, "such as a door and a button." Appx42-43 (FWD). In support of its understanding, the majority stated that Jiau does not teach "a hotspot having hidden content that is a hotspot" or "hotspots inside the interior of an object." Appx43-44 (FWD). Second, the majority concluded that

Figures 11(e) and 11(f) do not render the limitation obvious because Jiau does not "indicate[] that the pieces of furniture shown in … Figure 11(f) are either objects or have hotspots associated with them." Appx44 (FWD). Third, the majority found that the Petition did not "argue that it would have been obvious … to modify Jiau to add a hot spot (hidden content) to an activated hot spot (hidden material), such as the interior of a building." Appx45 (FWD).

### 3. The Dissent

The dissent concurred in the majority's determination that claims 1-11 and 13-19 of the '662 patent are unpatentable, but disagreed with the majority's conclusion that Jiau does not render obvious "the additional limitation recited in claims 12 and 20 that the hidden content comprises a second hot spot." Appx48 (FWD Dissent). Unlike the majority, the dissent concluded that the embodiments disclosed in Figures 11(e) and 11(f) of Jiau, as well as Jiau's extensive disclosures regarding objects and hotspots generally, render claims 12 and 20 obvious.

Specifically, the dissent found that "Jiau's inclusion of benches within the interior of object 1192 suggests, at the very least, that they are objects." Appx50 (FWD Dissent) (citing *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) ("[A] reference must be considered not only for what it expressly teaches, but also for what it fairly suggests." (quotations and citations omitted))). Further, if the benches are understood to be objects, the dissent found it persuasive that they "'may'

have hot spots" in light of Jiau's general teaching that objects may have hotspots. Appx50 (FWD Dissent) (citing Appx1116-1125 (Jiau), 11:19-20:12). Although Jiau does not expressly identify the benches in Figure 11(f) as "objects" that may contain "hotspots," the dissent did not find this to preclude a determination of obviousness because one "would not expect Jiau or any reference to belabor all of the possibilities associated with every item in a figure once the reference had laid out those possibilities in detail, as Jiau does by specifying types of objects and associated actions." Appx51 (FWD Dissent).

The dissent further noted that its reading of Jiau is "consistent with Jiau's overall teachings of 'allow[ing] users to explore and interact in a multi-owner three-dimensional virtual world.'" Appx50 (FWD Dissent) (quoting Appx1106 (Jiau), 1:31-32) (alterations in original). In the context of an explorable and interactive virtual world, the dissent found it reasonable to read Jiau as "suggest[ing] to a person of ordinary skill in the art including functionality via the disclosed objects in spaces encountered by the user" rather than limiting the user to "a blank room with no further functionality." Appx50 (FWD Dissent).

## <u>SUMMARY OF ARGUMENT</u>

The majority committed legal error by basing its conclusion of obviousness on Jiau's express disclosures and failing to properly consider what Jiau "fairly suggests" to a POSITA. *Bradium Techs.*, 923 F.3d at 1049 (quoting *In re Baird*, 16

F.3d 380, 383 (Fed. Cir. 1994)). The majority's determination was driven by the fact that Jiau does not provide a specific example of hidden content that includes a hotspot. Appx42-44 (FWD). However, the majority failed to evaluate whether Jiau as a whole suggests that hidden content may include additional hotspots. Having failed to do so, the majority's conclusion was not based on substantial evidence.

As the dissent correctly recognized, Jiau's broader disclosures about objects and hotspots suggests to a POSITA that hidden content may include hotspots. Appx49-51 (FWD Dissent). First, Jiau discloses that objects such as buildings may have a hidden interior that is activated and displayed when a hotspot such as a door is triggered. Appx1116 (Jiau), 11:21-28; Appx1120, 15:18-16:2; Appx1147-1148, Figs. 11(e), 11(f). Second, Jiau discloses that these hidden interiors may themselves contain objects, such as the benches shown in Figure 11(f). Appx1148 (Jiau), Fig. 11(f). Third, that Jiau discloses that any object may be "defined" to "take[] various actions" when activated by a user, including triggering "a pop-up ad or an animation" or "a web page." Appx1116-1117 (Jiau), 11:16-18, 12:1-2, 12:11-12. Collectively, these teachings would suggest to a POSITA that Jiau's hidden content may include objects, which, in turn, may be configured to contain additional hotspots. Accordingly, substantial evidence cannot support the majority's conclusion that Jiau does not render obvious the "second hot spot" of claims 12 and 20.

## STANDARD OF REVIEW

Obviousness is a "mixed question of fact and law." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). The Board's "ultimate conclusion that the claims are not obvious is a legal determination subject to de novo review." *Id.* The "subsidiary factual findings are reviewed for substantial evidence." *Id.*; *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015) (in appeal of obviousness determination, "[w]e review the Board's factual findings for substantial evidence and review its legal conclusions de novo"). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## ARGUMENT

### I. THE COURT SHOULD REVERSE THE MAJORITY'S DETERMINATION THAT JIAU DOES NOT RENDER OBVIOUS THE ADDITIONAL LIMITATION OF CLAIMS 12 AND 20

#### A. The Majority Improperly Focused on Jiau's Express Disclosures

The majority committed legal error because it reached its ultimate determination that claims 12 and 20 of the '662 patent are not obvious by narrowly focusing on whether or not Jiau expressly teaches "hidden content that is itself a hotspot." Appx43 (FWD). But obviousness does not require such a literal disclosure. *See MemoryWeb, LLC v. Samsung Elecs. Co., Ltd.*, No. 2024-1322, 2025

WL 3687250, at *4 (Fed. Cir. Dec. 19, 2025) ("[W]e have long held what a reference 'suggests' is an appropriate consideration in an obviousness analysis."). Instead, the Board should have considered what Jiau "fairly suggests" to a POSITA. *Bradium Techs.*, 923 F.3d at 1049. The Board failed to do so, which was legal error.

Importantly, the Petition did not contend that Jiau expressly discloses hidden content that includes a hotspot. Instead, the Petition argued that Jiau "renders obvious the additional limitation of claim 12" based on multiple teachings that, together, suggest that "hidden content may comprise additional hotspots … that are activated [by] a user." Appx141-142 (Pet.); *see also* Appx143 (addressing claim 20).

First, the Petition relied on Jiau's embodiments illustrated in Figures 11(e) and 11(f), which illustrate "an example of an object 1192" that has a "hotspot link 1194 (e.g., a door-shape)." Appx142 (Pet.); Appx1120 (Jiau), 15:18-22; Appx1147, Fig. 11(e) (annotated):




Fig. 11(e)

When the user activates door hotspot 1194, "the user passes to the interior of object 1192" and the computer "renders an interior view of the object," shown in Figure 11(f). Appx1120 (Jiau), 15:22-24; Appx1148, Fig. 11(f) (annotated).




Fig. 11(f)

Importantly, the interior view of the object itself contains two bench-shaped objects.

Second, the Petition relied on Jiau's teachings regarding objects generally, including that objects "may be associated with 'a plurality of hotspots'" that "may be 'activated separately' with 'different hotspot activities associated therewith.'" Appx142 (Pet.) (quoting Appx1126-1127 (Jiau), claims 8-10); *see also* Appx446-447 (Reply) (referencing "object with associated action – walking into this type of object will cause the user to view an action, such as a pop-up ad or an animation" (quoting Appx1117 (Jiau), 12:1-2)).

Based on these combined disclosures, the Petition concluded that Jiau's hidden content (such as the interior of object 1192) "***may comprise*** additional hotspots associated with the furniture [objects] in the building interior" that may be activated by a user. Appx141-142 (Pet.) (emphasis added). The Petition's analysis was supported by the expert declaration of Dr. José Zagal, who similarly concluded that Jiau's teachings make clear that "the furniture in the building interior … may comprise additional hot spots." Appx1005 (Zagal Dec.), ¶206.

The majority did not evaluate the obviousness theory presented in the petition and summarized above, based on what Jiau reasonably suggests. Instead, the majority focused narrowly on whether Jiau expressly discloses hidden content that contains a hotspot. For example, the majority incorrectly reasoned that Jiau's claims directed to objects with "a plurality of hotspots" do not support obviousness because they do not teach "a hotspot having hidden content that is a hotspot." Appx42

(FWD); *see also* Appx43 ("[N]othing in Jiau claims 9 and 10 indicates the presence of a hotspot containing hidden content that is itself a hotspot."). Similarly, despite acknowledging that Jiau discloses numerous categories of objects that include hotspots, the majority criticized Jiau for not expressly teaching that that interior of an object may contain a hotspot. Appx44-45 (FWD).

The majority similarly failed to consider the full scope of what Figures 11(e) and 11(f) suggest, concluding instead that these embodiments do not support obviousness because "[n]othing in Jiau's specification indicates that the pieces of furniture shown in Jiau Figure 11(f) are either objects or have hotspots associated with them." Appx44 (FWD). The fact that the majority questioned whether Figure 11(f) discloses objects at all is particularly telling because Figure 11(f) on its face illustrates objects (in the form of benches) present in the room. The majority's only rationale for questioning the presence of objects in the figure is the fact that Jiau does not expressly label the benches as "objects." Appx44 (FWD) ("[T]he specification is silent about the furniture and Jiau Figure 11(f) does not contain any item identification numbers pointing to the furniture."). But even Patent Owner did not dispute that the benches in Figure 11(f) are not objects—instead, Patent Owner only argued that Figure 11(f) does not disclose hotspots. *See* Appx371 (POR); *see also* Appx3997 (Akl Decl.), ¶106 (Patent Owner's expert asserting that Jiau does not "call[] out" or "identif[y]" hotspots in Figure 11(f)).

Where, as here, a figure in the prior art not only "teaches," but "plainly illustrates" the critical limitation of the challenged claims, and there is "no other reasonable understanding of th[e] figure," the majority's finding to the contrary "lacks substantial evidence" and should be reversed. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1379 (Fed. Cir. 2023). As discussed further below, if Jiau's Figure 11(f)—which illustrates the hidden content activated by the door hotspot of Figure 11(e)—contains objects, then Jiau plainly suggests those objects can be configured to include hotspots, like any other object in Jiau's virtual world. Thus, the majority's conclusion that Jiau does not disclose or render obvious hidden content that comprises a second hotspot cannot be supported by substantial evidence.

At no point did the majority consider whether Jiau's broader disclosure regarding the objects in its virtual world would suggest to a POSITA that objects contained within hidden content may include their own hotspots. Although the majority asserted that Jiau does not "teach[] ***or suggest[]*** a hotspot having hidden content that is a hotspot," Appx42 (FWD), the majority's opinion lacked any analysis regarding what Jiau ***suggests*** about hotspots and hidden content. Instead, the entirety of the majority's analysis turned on Jiau's exemplary disclosures and whether they expressly describe hidden content that contains a hotspot. *See, e.g.*, Appx44 (FWD) (concluding that Jiau does not "indicate[]" that the "pieces of furniture" in Figure 11(f) "are either objects or have hotspots" because "the

specification is silent about the furniture and Jiau Figure 11(f) does not contain any item identification numbers pointing to the furniture"); *see also* Appx44-45 (arguing that Jiau's description of "object with interior" does not describe "anything in the interior being a hotspot"). The majority did not respond to the disclosures relied on by the dissent (*see* Appx50-51) or attempt to explain why those disclosures do not fairly suggest that objects contained in hidden content (such as the interior of an object) may comprise hotspots.

### B. Jiau Fairly Suggests That Hidden Content May Include Additional Hotspots

As the dissent correctly recognized, if Jiau is considered for all that it fairly suggests, the only reasonable conclusion is that Jiau suggests that objects provided in hidden content (such as the interior of another object) may comprise a second hotspot. Appx49-51 (FWD Dissent). Because the majority's opinion failed to consider these disclosures—and, even more importantly, ignored what Jiau's figures "plainly illustrate[]," the majority's determination that Jiau does not render obvious hidden content comprising a second hotspot lacks substantial evidence and should be reversed. *PACT*, 61 F.4th at 1379.

First, Jiau discloses that the hidden content associated with an object may contain additional objects. For example, Figure 11(f), which depicts the hidden interior of object 1192 from Figure 11(e), plainly illustrates bench objects within that interior. Appx1120 (Jiau), 15:22-24; Appx1148, Fig. 11(f) (annotated).

Although Jiau does not expressly state that the benches are "objects," they are distinct from the floor and walls of the room—which are illustrated as a rectangular grid—and they are illustrated similar to other "objects" shown in different embodiments. *Compare, e.g.*, Appx1148 (Jiau), Fig. 11(f) *with* Appx1120 (Jiau), 15:3-8; Appx1146, Fig. 11(d) (showing objects 320 and 1184).




Fig. 11(f)




Fig. 11(d)

In addition, given Jiau's stated purpose of "allow[ing] users to explore and interact in a multi-owner, three-dimensional virtual world" that users can "design as they please," *see* Appx1106 (Jiau), 1:31-2:3, and Jiau's extensive disclosure of different types of objects and how they may be configured to implement different types of hotspots, *see, e.g.*, Appx1116-1118 (Jiau), 11:16-13:7, no reasonable understanding of Jiau could conclude that the interior structures of Jiau's virtual world are barren and devoid of any objects or interactive content. Appx50 (FWD Dissent); *see also PACT*, 61 F.4th at 1379 (Board's determination of nonobviousness "lack[ed] substantial evidence" where it was not based on a "reasonable understanding" of the prior art figures).

Second, Jiau discloses that objects may have multiple hotspots that may be separately activated and may perform different actions when activated. For example, Jiau discloses that an object may have ”a plurality of hotspots” that “hav[e] different hotspot activities associated therewith” and that are “capable of being activated separately.” Appx1126-1127 (Jiau), cls. 8-10. The majority determined that this “simply describes an object having multiple hotspots, such as a door and a button,” and does not “teach[] or suggest[] a hotspot having hidden content that is a hotspot.” Appx42 (FWD). But that determination was not based on substantial evidence because nothing in Jiau limits the hotspots to being displayed on an external surface of an object. To the contrary, Jiau discloses that the interior of an object is itself “defined as an attribute of” the object and may have its own “sub-coordinate system.” Appx1120 (Jiau), 15:23-27. In other words, the interior portion of the object is ***part of the object*** and could contain additional hotspots—just as Jiau teaches that other portions of the object may contain additional hotspots.

Third, in addition to the express example of multiple hotspots discussed above, Jiau also discloses that when a user “walks into an object or selects an object through a mouse click or similar means,” the computer system “takes various actions … depending on how the object is defined.” Appx1116 (Jiau), 11:16-18. These defined actions may include transporting the user to “the interior of the object,” “caus[ing] the user to view an action, such as a pop-up ad or an animation,” or

"caus[ing] a web page to be displayed." Appx1116-1117 (Jiau), 11:19-12:12. Jiau does not limit these object definitions to certain types of objects—to the contrary, Jiau makes clear that any object can be "defined" to have an "associated link" that causes the computer system to "take[] various actions, depending on the type of link." Appx1117 (Jiau), 12:13-15.

Although the majority concluded that Jiau does not expressly disclose that hidden content such as the interior of an object may contain a hotspot, Appx43-44 (FWD), the majority did not consider or discuss how Jiau's teachings regarding objects generally would apply to objects within the hidden interior of another object. Appx50-51 (FWD Dissent). Nowhere does Jiau teach or suggest that objects within the interior of another object are treated differently from other objects in the virtual world, or cannot be defined to contain a hotspot, and the majority did not point to any disclosure in Jiau—or any other evidence—to suggest otherwise. *See generally* Appx1116-1118 (Jiau), 11:16-13:7. To the contrary, Jiau discloses that all objects are defined using the same structure in the code of the virtual world. *See* Appx1124-1125 (Jiau), 19:18-20:3 ("Each object has an object id, a description of the object, and a link."); Appx1154, Fig. 17. Thus, once it is clear that the interior of an object can contain other objects—as Figure 11(f) plainly illustrates—it necessarily follows that those objects (*i.e.*, hidden content) can include their own hotspots.

In short, since Jiau is clear that hidden content (such as the interior of an object) may contain other objects, and Jiau broadly teaches that any object may be defined to contain one or more hotspot links, corresponding to different portions of the object, Jiau necessarily suggests that objects contained within hidden content may include their own respective hotspots. In reaching the opposite conclusion, the majority failed to apply a reasonable understanding of Figures 11(e) and 11(f) of Jiau, and failed to address or consider Jiau's disclosures about objects generally. Instead, the majority improperly relied on Jiau's express disclosures and embodiments, which did not state verbatim that object interiors contain other objects and may comprise hotspots. Accordingly the majority's determination cannot be supported by substantial evidence and should be reversed.

### C. Jiau Does Not Require Modification To Render Claims 12 And 20 Obvious

The majority also faulted the Petition for "not argu[ing] that it would have been obvious to a person having ordinary skill in the art to modify Jiau to add a hot spot (hidden content) to an activated hot spot (hidden material), such as the interior of a building." Appx45 (FWD). However, the Petition was not required to propose such a modification because Jiau renders claims 12 and 20 obvious without modification, as discussed above. Jiau already discloses that ***any*** object may be defined to include a hotspot link. Appx1116-1118 (Jiau), 11:16-13:7. Jiau also discloses a unified structure for defining objects and hotspot links in the virtual

world. *See* Appx1124-1125 (Jiau), 19:18-20:3; Appx1154, Fig.17. Accordingly, Jiau on its face fairly suggests that objects contained in hidden content, such as the interior of another object, may also be defined to include hotspot links, like any other object in Jiau's virtual world. No modification is needed.

## II. THE COURT SHOULD REMAND TO THE BOARD FOR FURTHER FACTUAL FINDINGS REGARDING INDEPENDENT CLAIMS 1 AND 13

For the reasons discussed above, the Court should reverse the majority's determination that Jiau does not render obvious the additional limitation of dependent claims 12 and 20, *i.e.*, hidden content comprising a second hotspot.

However, the Board's Final Written Decision did not at all address whether Jiau discloses or renders obvious the limitations of independent claims 1 and 13, from which claims 12 and 20 depend, because the Board determined that the independent claims are unpatentable based on a different set of grounds that did not rely on Jiau. *See* Appx36-47, Appx46-47 (FWD). Accordingly, the Court should remand this case to the Board to perform a complete obviousness analysis with respect to those independent claims based on Jiau. *See* Appx36-37, Appx41-45 (FWD).

## CONCLUSION

For the foregoing reasons, the Court should reverse the Board's finding in its Final Written Decision determining that Jiau does not render obvious the additional

limitation of dependent claims 12 and 20, and should remand to the Board for further factual findings regarding the independent claims 1 and 13 from which claims 12 and 20 depend.

Dated: April 13, 2026
Corrected: April 27, 2026

Respectfully submitted,

*/s/ James Glass*

James M. Glass
Ron Hagiz
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
jimglass@quinnemanuel.com
ronhagiz@quinnemanuel.com

Todd M. Briggs
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
(650) 801-5020
toddbriggs@quinnemanuel.com

Rachael L. McCracken
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000
rachaelmccracken@quinnemanuel.com

Quincy Lu
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1109 First Avenue, Suite 210
Seattle, Washington 98101
(206) 905-7000
quincylu@quinnemanuel.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(2)(A). The brief contains 5,606 words according to the word count of the word-processing system used to prepare the brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface, 14 point Times New Roman, using Microsoft Word.

Dated: April 27, 2026

*/s/ James Glass*
James Glass

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

*Counsel for Appellant*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

IPR2024-00209 Final Written Decision ......................................Appx1-Appx52

U.S. Patent No. 9,427,662.............................................................Appx53-Appx69

Trials@uspto.gov
571-272-7822

Paper 28
Date: April 24, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

PLR WORLDWIDE SALES LTD.,
Petitioner,

v.

FLIP PHONE GAMES, INC.,
Patent Owner.

---

IPR2024-00209
Patent 9,427,662 B2

---

Before DAVID C. MCKONE, DANIEL J. GALLIGAN, and SCOTT B. HOWARD, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* SCOTT B. HOWARD.

Opinion Concurring in Part and Dissenting in Part filed by *Administrative Patent Judge* DANIEL J. GALLIGAN.

HOWARD, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

PLR Worldwide Sales Ltd. ("Petitioner") filed a Petition for *inter partes* review (Paper 2, "Pet.") challenging claims 1–20 ("challenged claims") of U.S. Patent No. 9,427,662 B2 (Ex. 1001, "the '662 patent"). Flip Phone Games, Inc. ("Patent Owner") filed a Preliminary Response. Paper 6. With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 7) and Patent Owner filed a Preliminary Sur-reply (Paper 8). We instituted an *inter partes* review of claims 1–20 of the '662 patent on all grounds of unpatentability alleged in the Petition. Paper 9 ("Institution Decision" or "Inst. Dec.").

After institution of trial, Patent Owner filed a Response (Paper 12, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 21 "Pet. Reply"), and Patent Owner filed a Sur-reply to Petitioner's Reply (Paper 22, "PO Sur-reply").

An oral hearing was held on February 6, 2025, and the record contains a transcript of this hearing. Paper 27 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–11 and 13–19 are unpatentable and that Petitioner has not shown by a preponderance of the evidence that claims 12 and 20 are unpatentable.

## *B. Real Parties in Interest*

Petitioner identifies itself and Playrix Holdings Ltd. as real parties in interest. Pet. 1.

Patent Owner identifies itself as the real party in interest. Paper 3, 1 (Patent Owner's Mandatory Notices).[1]

*C. Related Matters*

Both parties identify the following district court proceeding as a related matter: *Flip Phone Games, Inc. v. PLR Worldwide Sales Ltd.*, Case No. 2:23-cv-00139-JRG (E.D. Tex.). Pet. 2; Paper 3, 1.

The parties also identify additional *inter partes* review proceedings. *See* Pet. 2; Paper 3, 1.

*D. The '662 Patent*

The '662 patent is titled "Methods and Systems for Providing In-Game Hot Spots" and "relates generally to systems and methods for providing in-game hot spots to a mobile communication device." Ex. 1001, code (54), 1:11–13. "A hot spot can be thought of as a location or item, sometimes hidden within the game, that triggers additional specialized content when activated by a user or some other in-game element." *Id.* at 1:67–2:3; *see also id.* at 4:13–15 ("Generally, a hot spot is an in-game feature that includes an activation element and a content element that is triggered by the activation element.").

The '662 patent explains that "all video games tend to have a popularity life span" and "[a]s game elements become increasingly familiar to players, the game may hold less surprises and/or no longer present a challenge to the user," such that "games that hold user interest for longer periods of time are more valuable than games that users leave behind quickly." Ex. 1001, 1:31–44. Taking these considerations into account, the

---

[1] Patent Owner did not paginate its Mandatory Notices. All citations are based on the page after the title page being page 1.

’662 patent discloses systems and methods that provide hot spots of triggered content within the gaming environment of a mobile video game on a mobile communication device. *Id.* at 1:64–67. According to the ’662 patent, providing hot spots of triggered content within a mobile gaming environment, and updating in-game hot spot information, may prolong user interest in the game, as it may “allow game companies to keep game elements fresh and prolong user enjoyment of the game.” *Id.* at 2:3–6, 4:24–31. For example, new interactive items and/or hidden features may be placed within a particular scene in the game so that the user has something new to look at or trigger (sometimes unexpectedly). *Id.* at 4:28–35.

The ’662 patent describes a mobile communication device programmed to: operate a video game; contact a remote system to check for hot spot information to use in the video game; download the hot spot information to the communications device from a server; designate a location in-game for activating the hot spot; detect manipulation of the designated location as activating the hot spot; and display content when the device’s user activates the hot spot. Ex. 1001, 2:13–23.

A hot spot’s activation element may comprise an area location or an item, sometimes hidden in the game, that can be triggered by a user or some other in-game element. Ex. 1001, 2:31–33. The hot spot information may identify content (a content element) to be displayed when the hot spot is activated, such as a promotional message; non-promotional content; a message including a hint related to the game; and a new game level or an item useful in playing the game. *Id.* at 2:38–48. More particularly, hot spot information may include information that allows the mobile communication device to designate a location in-game (such as an item or hidden area) for

activating the hot spot. *Id.* at 4:15–23. When the location is electronically manipulated in some way during game play, such as by touching it, running over it, hitting it with an item, etc., the content associated with the hot spot may be displayed. *Id.*

Figures 2A and 2B of the '662 patent are reproduced below.




FIG. 2A FIG. 2B

Figures 2A and 2B "are diagrams of an exemplary scene in a video game played on a mobile communication device." Ex. 1001, 3:48–51; *see also id.* at 6:44–46. The exemplary scene is a darts game, which includes dart board 210. *Id.* at 6:46–48. Figure 2A shows several items 210, 220, 225, 230, and 235 within scene 200. *Id.* at 6:52–53. Any of these items may be defined as hot spots on the mobile communication device. *Id.* at 6:53–55. For instance, if the user throws a dart that hits shirt 230, a promotional message associated with third party X may pop up on screen. *Id.* at 6:55–57. Messages might also be displayed if the user activates hot spots on poster

225 or chalk board 220. *Id.* at 6:59–61. Additionally, if the user activates a hot spot defining a piece of chalk 232, a new message might be drawn on chalk board 220. *Id.* at 6:61–63.

As shown in Figure 2B, a hot spot may be assigned to window 222. Ex. 1001, 7:22–23. When the user hits the window with a dart, the hot spot is activated, and activation causes the mobile communication device to display content, such as an animation of window 222 shattering. *Id.* at 7:23–26. The hot spot information may include coordinates for defining the placement and/or boundaries of the window, the window graphic, the shatter animation content, and coordinates for displaying the animation. *Id.* at 7:28–32.

### *E. Illustrative Claim*

The ’662 patent includes 20 claims, all of which are challenged. Claims 1 and 13 are independent claims. Claim 1, which is illustrative, is reproduced below.

> 1. [1(pre)] A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:
>
> [1(a)] a) contacting a server for hot spot information to download, comprising providing the server with at least one of: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, a version identifier for hot spot information currently on the mobile communication device, user-identification information, preset location, amount of game-play time, game score, and level of play;

[1(b)] b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:

[1(b)(1)] 1) hidden content for presenting to the user when the hot spot is activated; and

[1(b)(2)] 2) coordinate information;

[1(c)] c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;

[1(d)] d) displaying an object at the designated non-promotional location; and

[1(e)] e) displaying the hidden content when the user activates the hot spot.

Ex. 1001, 14:36–65; *see also* Pet. v (adding brackets).

### *F. Prior Art and Asserted Grounds*

We instituted trial on the following grounds:

| Claims Challenged | 35 U.S.C. §[2] | References/Basis |
|---|---|---|
| 1–11, 13–19 | 103(a) | Ho,[3] Aoki[4] |
| 1–20 | 103(a) | Jiau,[5] Aoki |

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013. Petitioner applies the pre-AIA version. *See* Pet. 11, 13, 36, 58 (arguing that asserted prior art references are prior art under various provisions in pre-AIA § 102). Patent Owner agrees. PO Resp. 3–5 (arguing that claims of the '662 patent can rely on a June 2007 filing date). Because we would reach the same result under the either version of the statute, we need not determine which one applies.

[3] WO 2008/008038 A1, published January 17, 2008, filed designating the United States July 12, 2006 (Ex. 1004). All citations are to the native pagination.

[4] US 2002/0120589 A1, published August 29, 2002 (Ex. 1005).

[5] WO 2000/070489, published November 23, 2000 (Ex. 1006). All citations are to the native pagination.

| Claims Challenged | 35 U.S.C. §[2] | References/Basis |
|---|---|---|
| 1–11, 13–19 | 103(a) | Ho, Kim[6] |
| 1–20 | 103(a) | Jiau, Kim |

Petitioner relies on the testimony of José Zagal, Ph.D. (Ex. 1003). Patent Owner relies on the testimony of Robert Akl, D. Sc. (Ex. 2006). Neither Dr. Zagal nor Dr. Akl were cross-examined in this proceeding.

## II. ANALYSIS

### *A. Legal Standards*

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set out a framework for assessing obviousness under 35 U.S.C. § 103 that requires consideration of four factors: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) if in evidence, "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *Id.* at 17–18. "While the sequence of these questions might be reordered in any particular case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the United States Court of Appeals for the Federal Circuit has repeatedly emphasized that "it is error to reach a conclusion of obviousness until all those factors are considered," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).

Because Patent Owner does not address objective evidence of non-obviousness, we focus solely on the first three *Graham* factors.

[6] US 6,928,414 B1, issued August 9, 2005 (Ex. 1007).

*B. Level of Ordinary Skill in the Art*

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim would have been obvious over the prior art. *See Graham*, 383 U.S. at 17–18.

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.*

Petitioner contends that a person having ordinary skill in the art at the time of the invention would have had "an undergraduate degree in game design, computer science, computer engineering, or a related field, with at least two years of experience working with computer gaming systems or software application development," and that "[l]ess work experience may be compensated by a higher level of education or vice versa." Pet. 10–11 (citing Ex. 1003 ¶¶ 73–78).

Patent Owner argues for a slightly different level of ordinary skill in the art: "a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, along with one to two

years of experience developing or programming video games or video game systems, or similar types of computer systems." PO Resp. 2 (citing Ex. 2006 ¶ 29). Patent Owner further argues that the person having ordinary skill in the art "may have additional education that might substitute for some of the experience, and additional experience might substitute for some of the educational background." *Id.* (citing Ex. 2006 ¶ 29). According to Patent Owner, Petitioner's proposal does not require experience in programming video games. *Id.* at 3. However, Patent Owner states, "[t]his difference does not materially affect the analysis presented below." *Id.*

We see very little difference between the parties' respective proposals. We adopt Patent Owner's marginally more specific proposal. Additionally, because we would reach the same conclusions under Petitioner's proposal, we agree with Patent Owner that this does not affect our analysis.

### *C. Claim Construction*

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips*. *See* 37 C.F.R. § 42.100(b) (2023). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,' which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

Petitioner "does not believe any terms require construction to resolve the patentability disputes because the challenged claims are rendered

unpatentable by the cited art under any reasonable interpretation of the claims." Pet. 11.

Patent Owner argues that the plain and ordinary meaning of "downloading" excludes "real-time fetching of data by a client from a server system." PO Resp. 34; *see also* PO Sur-reply 16–17; Tr. 32:22–34:7.

Because we need not expressly construe any claim terms, we do not construe any terms of the '662 patent. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. *Whether Ho is a "Printed Publication" Prior Art Within the Meaning of 35 U.S.C. § 311(b)*

Patent Owner argues that because Ho was published after the filing date of the '662 patent, Ho is not a "printed publication" within the meaning of 35 U.S.C. § 311(b). PO Resp. 30–33; PO Sur-reply 15–16.

The Federal Circuit has rejected this argument, holding that:

> a published patent application is, by its literal terms, a "printed publication." So, when § 311(b) permits IPR challenges based upon "prior art . . . printed publications," it includes within its literal scope challenges based upon a published patent application. And, by virtue of § 102(e)(1), a published patent application—this specific type of "printed publication"—is deemed prior art as of its filing date. Therefore, the plain language of §§ 311(b) and 102(e)(1) permits IPR challenges based upon published patent applications, and such published patent applications can be deemed prior art in IPRs as of their filing date.

*Lynk Labs, Inc. v. Samsung Elecs. Co.*, 125 F.4th 1120, 1127 (Fed. Cir. 2025). Thus, Petitioner asserts permissible grounds of unpatentability under

35 U.S.C. § 311(b) by arguing that claims 1–20 are unpatentable under 35 U.S.C. § 103(a) on the basis of Ho, which is a prior art printed publication, and either Aoki or Kim.

*E. Obviousness Based on Ho and Aoki*

Petitioner argues that claims 1–11 and 13–19 would have been obvious over Ho and Aoki. Pet. 3, 11–36. For the reasons set forth below, Petitioner has shown by a preponderance of the evidence that claims 1–11 and 13–19 are unpatentable.

*1. Overview of Ho*

Ho is titled "An Incentive-Based Video Gaming System" and relates to "incorporating [an] interactive information element into a video game." Ex. 1004, code (54), 1:5–7.

Ho describes prior systems as offering "in-game advertising to 'capture' eyeballs"; however, the advertisements were "restricted to in-game . . . non-interactive in-game elements" and, thus, provided "no impetus for the player to pay more attention," e.g., "to the static advertisements." Ex. 1004, 1:19–31. Ho generalizes the prior technology as having "no methods available to incorporate interactive and update-able advertisements into existing video games." *Id.* at 1:35–37.

Ho "provide[s] a method of playing a video game with at least one interactive information element incorporated within the game," e.g., "an icon in the game, a character in the game[,] or an item in the game." Ex. 1004, 2:1–12. "[T]he player ha[s] an option to engage the at least one interactive information element . . . ." *Id.* at 2:2–5. Preferably, "gameplay is not disrupted when the . . . element is engaged[,] the . . . element is not mandatory for continuation of gameplay[,] the . . . element may be either

advertisements or public announcement services," and "the . . . element is able to be updated." *Id.* at 2:1–18.

"[I]ncorporating . . . [the] element into a video game[] include[s]: adding an engageable module into the video game; updating the engageable module with the . . . element; and locating the . . . element at a juncture in the video game." Ex. 1004, 2:35–38. "The juncture . . . may be either a specific event . . . or a specific location in the game." *Id.* at 3:1–2. Preferably, "the engageable module may be updated either locally or from a remote source via a network." *Id.* at 2:40–3:1.

"Engagement of the . . . element may activate an action," e.g., "an on-screen presentation, an electronic token generation." Ex. 1004, 3:10–12. "The on-screen presentation may be either within the course of gameplay or in a sub-screen in the game." *Id.* at 3:12–13. "Electronic tokens may also be stored either locally or on a network." *Id.* at 3:13–14.

Ho's Figure 3, reproduced below, illustrates examples of interactive information elements being incorporated in a MMORPG (massively multiplayer online role playing game). Ex. 1004, 5:1–2.




As shown in Figure 3, at a particular juncture in gameplay, a character 52 in the MMORPG controlled by the player encounters some interactive information elements such as (i) a "wings" button 54 to enable character 52 to fly (an example of an icon in the game), (ii) a hamburger monster 56 (an example of a character in the game), and (iii) a car 58 (an example of an item in the game). *Id.* at 5:1–25. Each interactive information element 54, 56, and 58 may be linked/related to a particular advertiser. *Id.* Interactive information elements 54, 56, and 58 may be engaged in different ways, with the way of engaging interactive information elements 54, 56, 58 depending on the type of element being engaged. *Id.* For example, hamburger monster 56 may be engaged only when character 52 fights and successfully slays the hamburger monster, car 58 may be engaged when character 52 enters the car, and "wings" button 54 may be engaged (for example when character 52 wishes to fly) by clicking on icon 54 using a pointer, or by using an enclosure moving between different icons to highlight icon 54 to engage the

icon. *Id.* The player may be informed of a reward prior to engaging the interactive information element(s). *Id.*

If the player chooses to engage any of interactive information elements 54, 56, and 58 in one of a number of ways, an action may be activated. *Id.* at 5:27–38. For example, highlighting icon 54 may activate an on-screen presentation that may be within the course of gameplay or in a sub-screen in the game. *Id.* The on-screen presentation may be, for example, an airliner with a particular airline's (an advertiser) paint scheme flying across the screen (overlaid on the game environment) trailing a catchphrase of the airline. *Id.* Making character 52 enter car 58 may activate the generation of a roar of an engine starting and revving recorded from an engine of an actual car depicted by car 58. *Id.* Making character 52 slay hamburger monster 56 may generate a sub-screen showing an advertisement of a chain of fast food restaurants, with the sub-screen overlaid on the game environment so as not to be disruptive to gameplay. *Id.*

*2. Overview of Aoki*

Aoki is titled "Game Advertisement Charge System, Game Advertisement Display System, Game Machine, Game Advertisement Charge Method, Game Advertisement Output Method, Game Machine Control Method and Program." Ex. 1005, code (54). Aoki's game advertisement charge system includes a "means for displaying an advertisement on a game screen; means for obtaining displayed amount information concerning a displayed amount of the advertisement displayed; and means for calculating a charge amount to be charged for displaying the advertisement based on the displayed amount information obtained." *Id.* ¶ 9.

Aoki uses an "advertisement management server 50 [which] is a known server computer system, and can update the content of a game advertisement to be output to a game terminal such as game machine 56." Ex. 1005 ¶ 62. Advertisement manager server 50 includes an advertisement management database 48 which can output a game advertisement "while a game is being performed at a game terminal." *Id.* ¶ 67. "[A]dvertisement management database 48 is configured to store 'advertisement ID', 'image path', 'game ID', '*advertisement placement location data*', 'advertisement period', 'advertiser ID', 'accumulated charge point', 'advertisement target data', and 'advertisement placement location rank', all being mutually associated." *Id.* ¶ 72 (emphasis added). "'Advertisement placement location data' indicates a specific texture image and a location therein in the game identified by the relevant game ID, where the relevant advertisement image is to be embedded. As shown, 'advertisement placement location data' includes 'texture image ID' and 'replacing position.'" *Id.* "'[R]eplacing position' is information, expressed in X and Y coordinates, specifying a position in each texture image, where an advertisement image is to be embedded." *Id.*

*3. Claim 1*

*a) Limitation 1(pre): The Preamble*

The preamble of claim 1 recites "[a] method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device." Ex. 1001, 14:36–39. Petitioner argues that Ho teaches the preamble. Pet. 20. Patent Owner does not separately address the preamble. *See* PO Resp. 10–33.

We agree with Petitioner. Specifically, Ho teaches using interactive information elements which are incorporated in a video game that is displayed on a screen. *See*, *e.g.*, Ex. 1004, code (57); Ex. 1003 ¶¶ 88–89. Because those interactive information elements can display hidden information, such as an advertisement, when activated by a user, they are "hot spots" as used in the '662 patent. *See* Ex. 1004, 5:9–38; Ex. 1003 ¶ 89. Additionally, "[t]he video game may be run on a device such as . . . a mobile telephone [or] a personal digital assistant." Ex. 1004, 2:20–22.

*b) Limitation 1(a): The "Contacting" and "Providing" Step*

Limitation 1(a) recites:

> *contacting a server for hot spot information to download*, comprising *providing the server with at least one of*: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, *a version identifier for hot spot information currently on the mobile communication device, user-identification information*, preset location, amount of game-play time, game score, and level of play.

Ex. 1001, 14:39–51 (emphases added). Petitioner argues that either Ho or the combination of Ho and Aoki teaches this limitation. *See* Pet. 21–25; Pet. Reply 2–13. For the reasons discussed below, we are persuaded by Petitioner's arguments.

*(1) Contacting and Providing Information*

Ho teaches that a "client end device" such as a "mobile telephone" may "connect[] to a server" to download "new interactive information

element(s)" from the server to the mobile telephone. Ex. 1004, 10:3–6, 10:14–17. Once the connection is made, the client device/mobile telephone will provide the server with information. *Id.* at 10:6–8; Ex. 1003 ¶ 112. That information includes at least one of the items recited in limitation 1a. (We discuss the specific information in the following subsections.[7]).

Patent Owner argues that Ho teaches "that a 'module' may be 'added' to an already-published video game or a video game 'in the midst of development.'" PO Resp. 12 (quoting Ex. 1004, 9:26–28). Patent Owner further argues that "[t]he 'module' enables an 'interactive information element' to be 'added' or 'updated' to the game by '***automatically*** downloading and replacing relevant sub-modules of the interactive information element[] in the video game ***whenever the player goes online***.'" *Id.* (quoting Ex. 1004, 9:29–33 and citing *id.* at 6:28–36, 9:10–18; second alteration in original); *see also* PO Sur-reply 1. According to Patent Owner, a person having ordinary skill in the art would have understood "that Ho teaches that, when a client device goes online, the server in Ho 'automatically' 'determines whether the interactive information element(s)' is 'legitimate' and/or 'needs to be changed/renewed,' and then sends interactive information elements to the client device." PO Resp. 12 (citing Ex. 1004, 9:29–33, 10:14–25, Fig. 5; Ex. 2006 ¶¶ 58–60). Because the information is automatically sent, Patent Owner argues that "[t]here is no disclosure or suggestion in Ho that the client device in Ho affirmatively contacts and provides to the server any one of the items of information listed

[7] Petitioner argues that Ho or the combination of Ho and Aoki teach seven of the identified types of information. *See* Pet. 21–24; Tr. 5:13–14. Because we find that the prior art teaches two of them, we need not address Petitioner's arguments regarding the other five types of information.

in claim 1 of the ’662 Patent in connection with seeking an interactive information element(s).” *Id.* (citing Ex. 2006 ¶¶ 57–72); *see also* PO Sur-reply 1.

We do not agree with Patent Owner’s argument. It is true, as Patent Owner argues, that Ho states that the system automatically uploads updates: “The module may allow the at least one interactive information element to be updated by automatically downloading and replacing relevant sub-modules of the interactive information elements in the video game whenever the player goes online.” Ex. 1004, 9:31–33. However, the paragraph continues by describing Ho Figure 5 (not reproduced) and provides more detail on how that updating is performed. Specifically, Ho explains that the server must first determine if the interactive element is legitimate and needs to be changed:

> Referring to Figure 5, there is shown a preferred method of client end and server interaction for the present invention. Firstly, the client end device, such as, for example, a personal entertainment system, a video games console, a mobile telephone, a personal digital assistant, a notebook and a desktop computer may be activated and subsequently connected to a server via a network (100). *The server may then obtain data from the client end device and determine whether the interactive information element(s) is legitimate (102) as the interactive information element(s) may be illegally modified*. If the interactive information element(s) is found to be not legitimate, the interactive information element(s) is then removed from the client end device (104). *If the interactive information element(s) is found to be legitimate, the server check information on the client end device relating to the interactive information element(s) (106)* and may include the downloading of the incidence of interactive information element(s) activation for processing as described in an earlier portion of the description. *Subsequently, the server then determines whether the interactive information element(s) needs to be changed/renewed (108)*. If

> the interactive information element(s) needs to be changed/renewed, then new interactive information element(s) are sent to the client end device (112). If change/renewal of the interactive information element(s) is not required, then the interactive information element(s) remains the same in the client end device (110).

Ex. 1004, 10:1–19 (emphases added). As Figure 5 and the explanatory text make clear, the client device sends information to the server before the server can determine if the update is necessary, and, if so, the server sends the update. *See id.*; Ex. 1003 ¶¶ 111, 116. Because Ho describes how information must be sent before the automatic update takes place, "automatically downloading" refers to without the user's input, not without data being sent by the client device.

As will be discussed below, the information that is sent includes version identifier information (subsection 2) or when combined with Aoki, user-identification information (subsection 3).

*(2) Version Identifier*

Ho describes how new video game modules may be published after the original release. Ex. 1004, 9:25–28. That module may enable new interactive information elements or updated interactive information elements. *Id.* at 9:29–33. Prior to providing the update, Ho teaches that the system will "determine[] whether the interactive information element(s) needs to be changed/renewed (108)." *Id.* at 10:14–19. A person having ordinary skill in the art would have understood that the mobile phone would have to provide version information in order for the server to know whether the update is needed. Ex. 1003 ¶ 116. This is consistent with the knowledge of a person having ordinary skill in the art as reflect in the prior art. *See*

Ex. 1020[8] ¶ 19 (“When new levels and/or versions are applied to the game the content provider modifies the games content. Modified games content has an associated identifier tag that identifies the version that has been used in its construction.”). Accordingly, Ho teaches providing “a version identifier for hot spot information currently on the mobile communication device.” *See* Ex. 1003 ¶ 116.

Patent Owner argues Ho does not teach or render obvious “contacting a server for hot spot information to download, comprising providing the server with . . . a version identifier for hot spot information currently on the mobile communication device” as recited in claim 1. PO Resp. 19–21; PO Sur-reply 7–10.

First, Patent Owner argues that Ho simply checks some “unspecified” information relating to interactive information elements prior to determining if the element needs to be changed or renewed. PO Resp. 19–20; PO Sur-reply 8; Ex. 2006 ¶ 70. According to Patent Owner, “[t]here is no disclosure or suggestion in Ho, however, of a ‘version identifier’ associated with any interactive information element(s), let alone the provision of such a ‘version identifier’ to Ho’s server by a client device in Ho.” PO Resp. 20 (citing Ex. 2006 ¶ 70). Instead of a version identifier, according to Patent Owner’s expert, a person having ordinary skill in the art would have understood that Ho would simply check “the date and time the interactive information element was last modified, and/or the date and time of the last connection to the server by the client device.” Ex. 2006 ¶ 71; *see also* PO Sur-reply 8–9.

---

[8] Hannay, US 2003/0100355 A1, published May 29, 2003.

We do not agree with Patent Owner's argument. Neither claim 1 nor the '662 patent limits what is used as a version identifier. Although a version identifier may be a specific identifier tag to denote the version, claim 1 is not so limited. Even if, as Dr Akl testified, Ho looks at the last date and time the program was modified, that date and time serves as a version identifier which would inform the server what updates are needed; that is, new updates made after the date and time of the last modification.

Patent Owner has not argued that "version identifier" as recited in claim 1 should be limited to any specific modality and we decline to do so on our own. *See* PO Resp. (providing no claim constructions). Accordingly, any such argument is forfeited. *See* Paper 10, 9 (Scheduling Order) ("Any arguments not raised in the response may be deemed forfeited.").

Moreover, the specification of the '662 patent supports a broad reading of the phrase "version identifier." The specification of the '662 patent uses both the terms "version identification numbers" and "a version identifier." *Compare* Ex. 1001, 9:44–53 (using "version identification numbers"), *with id.* at 11:30–45 (using "version identifier"). Had the inventor wanted to limit the claimed invention to a version identification number, as opposed to anything that might act as a version identifier, the inventor knew how to do so. Because the inventor used the broader "version identifier" in the claims, it would be erroneous for us to narrow it to a version identification number.

Moreover, the '662 patent indicates that "any known algorithm for checking whether content has previously been downloaded, thus reducing download redundancy, may be used in an embodiment," not just one using version identifier numbers. Ex. 1001, 11:45–47. That would include

checking for the last date and time the game was updated. Accordingly, version identifier is broad enough to encompass any information used for determining the version, including when the data was last modified.

Second, Patent Owner argues that Petitioner is engaging in "impermissible *ex post* reasoning and hindsight bias that *KSR* warned against." PO Resp. 20 (citing *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019)); *see also id.* ("Petitioner 'may not resort to speculation, unfounded assumptions or hindsight reconstruction to supply deficiencies in its factual basis.'" (quoting *In re Warner*, 379 F.2d 1011, 1017 (CCPA 1967))). Patent Owner further argues that "the Board likewise 'cannot accept' Petitioner's unsupported speculation 'as a replacement for documentary evidence for core factual findings.'" *Id.* (quoting *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014)). In further support of this hindsight argument, Patent Owner argues that Dr. Zagal "simply repeats Petitioner's speculative argument with little other support or analysis—and is thus entitled little to no weight." *Id.* at 20–21.

We do not agree with Patent Owner's argument. First, although Dr. Zagal's testimony is substantially the same as the Petition, that is not inconsistent with our rules. Our rules simply require that the expert witness must disclose "the underlying facts or data on which the opinion is based." 37 C.F.R. § 42.65(a). Dr. Zagal has done just that by citing the portion of Ho that he is relying on and explaining his reasoning. *See* Ex. 1003 ¶ 116. Dr. Zagal also cites to Hannay as corroborating evidence. *Id.* Such testimony is not, as Patent Owner contends, "conclusory."

Moreover, neither Petitioner nor Dr. Zagal have used impermissible hindsight. Dr. Zagal's testimony—which we find credible—does not

discuss adding additional elements or modifying Ho. Instead, Dr. Zagal simply explains how a person having ordinary skill in the art would have understood how Ho operates. *See* Ex. 1003 ¶ 116. That is not hindsight.

Third, Patent Owner argues that Petitioner's reliance on Hannay is improper. PO Resp. 21; PO Sur-reply 9–10. Patent Owner concedes that Hannay discloses that "as 'new levels and/or versions' of its video game are created, some 'games content' therein may have 'an associated identifier tag that identifies the version that has been used in its construction.'" PO Resp. 21 (citing Ex. 1020 ¶ 19). However, Patent Owner argues that because the Petition "fails to rely on Hannay in this or any Ground in the Petition" and does not provide a reason to combine Hannay with Ho with a reasonable expectation of success, Petitioner's use of Hannay is improper. *Id.*; *see also* PO Sur-reply 9–10.

We do not agree with Patent Owner's argument. Petitioner and Dr. Zagal are not relying on Hannay to supply a missing element. Instead, they are simply using Hannay as corroboration of Dr. Zagal's testimony as to how a person having ordinary skill in the art would have understood the teachings of Ho. *See* Pet. 23–24; Pet. Reply 9 ("Petitioner also included corroborating evidence that confirmed version identifiers are used to determine if gaming modules or elements need to be changed or renewed."); Ex. 1003 ¶ 116. There is nothing improper with using additional references as corroboration. *See IXI IP, LLC v. Samsung Elec. Co.*, 903 F.3d 1257, 1262–63 (Fed. Cir. 2018) (affirming PTAB decision of unpatentability where the Board relied on an additional reference that corroborated the expert's testimony); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the

knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

*(3) User-identification Information*

Aoki teaches a system for determining how to charge for advertisements based on various factors. Ex. 1005, code (57), ¶ 7. As part of the process, Aoki teaches sending user-identification information as part of the request for additional advertisements. This is shown in Aoki Figure 8, which is reproduced below.

FIG. 8




Aoki Figure 8 "is a flowchart explaining an advertising process executed at the time of activating a game terminal (an activation advertisement process)." Ex. 1005 ¶ 77. In step S101, "a game terminal first reads its advertisement database to check whether or not there is any record with its 'advertisement period' no longer including the present date." *Id.* If no record is found, it proceeds to step S104, in which case a new advertisement is downloaded and then (step S105) a new record is added. *Id.*

However, when an advertisement record is found, then step S102 is performed and "the 'advertisement point' included in that record is uploaded to the advertisement management server." Ex. 1005 ¶ 77. Included in the information the client device sends to the server is "user information, such as the ID of the player who uses the game terminal. The information will be used in an advertisement charge process applied in the advertisement management server." *Id.* After the record is deleted (step S103), the advertisement is sent (step S104) and a new record added (step S105). *Id.* In other words, in cases where there is an advertisement record, before a new advertisement can be sent from the server to the client device, the client device must send "the ID of the player who uses the game terminal," that is, "user-identification information," to the server. *Id.* ¶ 77, Fig. 8; *see also* Ex. 1003 ¶ 117 ("Aoki discloses that a game terminal (e.g., a 'telephone') that is operable to run a video game provides an advertisement management server 'the ID of the player who uses the game terminal' and a 'game ID identifying a game' in order to obtain advertisements." (quoting Ex. 1005 ¶ 77)).

A person having ordinary skill in the art would have combined Aoki's teaching of using user-identification information as part of the request for an advertisement with Ho's system, which also teaches a client device sending information to a server to request hot spot information, such as advertisements. *See* Ex. 1003 ¶¶ 103–107, 111, 114, 117. Because both Ho and Aoki are directed to improvements in game design and monetization from using advertisements (*id.* ¶ 106; Ex. 1004, 1:26–28; Ex. 1005 ¶¶ 6–8), a person having ordinary skill in the art would have looked at both Ho and Aoki and combined the relevant features with a reasonable expectation of

success (Ex. 1003 ¶¶ 103, 106, 117). A person having ordinary skill in the art would have appreciated that using Aoki's teaching of sending user-identification information with Ho, which includes sending information with a request for information relating to interactive information elements (hot spots), allows for targeted advertisements, which was a known advantage in advertising. *Id.* ¶ 117; Ex. 1008[9] ¶¶ 54–55 (describing advantages of targeted advertising).

Patent Owner argues that the combination of Ho and Aoki does not teach this limitation. PO Resp. 21–25; PO Sur-reply 10–14.

First, Patent Owner argues that "Aoki does not teach propagation of an advertisement in game based on 'the ID of the player who uses the game terminal.'" PO Resp. 23 (quoting Ex. 2006 ¶ 75); *see also id.* at 22–23 (describing Aoki); PO Sur-reply 11 (same). "Rather," Patent Owner argues, "at most, Aoki teaches only ***post-display*** analysis of information regarding a user that viewed an advertisement (at the back end) in the context of setting the charge for that advertisement to its publisher." PO Resp. 23 (citing Ex. 2006 ¶ 75).

We do not agree with Patent Owner. As discussed above in connection with Aoki Figure 8, Aoki describes a process in which, when there is a record of a past advertisement, user-identification information—the "id of the player"—is sent from the client device to the server (step S102) before the server sends an advertisement (step S105). *See* Ex. 1005 Fig. 8, ¶ 77; Ex. 1003 ¶ 117. Because claim 1 does not have any limitation requiring that hot spot information (the advertisement) be based on the information sent from the client to the server as part of the request, it is

[9] Sturman, WO 2006/071246 A1, publication date July 6, 2006.

inapposite that Aoki uses the user identification information for post-display analysis. All that matters is that in some circumstances, the client sends user-identification information to the server as part of contacting the server for additional advertisements.

Additionally, it does not matter that this specific order of steps occurs only some of the time. As the Federal Circuit has held, "combinations of prior art that sometimes meet the claim elements are sufficient to show obviousness." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016); *see also Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention.").

Patent Owner's reliance on Aoki paragraphs 88 and 89 does not require a different result. *See* PO Resp. 22–23. Those paragraphs describe a different flow chart (Figure 12) and have no bearing on our findings regarding the flow chart set forth in Aoki Figure 8. *See* Ex. 1005 ¶ 88. More particularly, Aoki discloses that "user information," among other information, is "uploaded to the advertisement management server 50 from a game terminal at the time of ending the game." Ex. 1005 ¶ 88. Although this disclosure shows user identification information being sent after an ad is downloaded, Aoki elsewhere describes transmission of such user information before an ad is retrieved under certain circumstances, as shown in Figure 8. Ex. 1005 ¶ 77.

Second, Patent Owner argues that that the combination of Ho and Aoki would "only provide the server with the 'ID of the player' ***after*** the downloading of an interactive information element and display of the

content associated therewith—for calculation of a 'charge point' for the content in accordance with Aoki's advertisement charge process." PO Resp. 23 (citing Ex. 2006 ¶ 76); *see also* PO Sur-reply 11. That is, Patent Owner describes what would happen if Aoki's advertisement charge system, which Patent Owner contends only sends user-identification information after an advertisement has been played, was added to Ho's system. *See* PO Resp. 23 (citing Ex. 2006 ¶ 76); *see also* PO Sur-reply 11.

We do not agree. For the same reasons discussed above, we do not agree with Patent Owner's premise that Aoki does not include user-identification information in a request for an additional advertisement. Instead, in some situations, the client device must send user identification information (a user ID) to the server as part of contacting the server for an advertisement before the server sends an advertisement to the client device. *See* Ex. 1005 ¶ 77, Fig. 8.

Moreover, Patent Owner's argument is based on attempting to bodily incorporate the two references. That is improper. "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (quoting *In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981)). Instead, the question is whether "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Id.* (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)); *see also In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) (explaining that whether one reference can be incorporated in another is "basically irrelevant" since the test for obviousness is "not

whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole").

Instead, we focus on Petitioner's theory on how a person having ordinary skill in the art would have combined the teaching of Aoki with Ho's method. In that regard, Petitioner's argument is not, as Patent Owner focuses on, adding Aoki's charging system to Ho. Instead, Petitioner and Dr. Zagal argue that a person having ordinary skill in the art would have taken Aoki's teaching of sending user-identification information and combined it with the information Ho's client sends to the remote server for information on the interactive information elements (hot spots) to provide targeted advertisements. *See* Ex. 1003 ¶ 117; Pet. 24. And, as discussed above, based on the evidence in the record, including the testimony of Dr. Zagal, that argument is persuasive.

Third, Patent Owner argues "that Dr. Zagal simply repeats Petitioner's argument verbatim" and is therefore "entitled little to no weight." PO Resp. 24; *see also* PO Sur-reply 11–12

For the same reasons discussed above in subsection (2), we do not agree with that argument. As with the version identifier argument, Dr. Zagal's testimony—which we find credible—identifies the portions of Aoki he is relying on, which provide corroboration for his reason to combine the references. *See* Ex. 1003 ¶ 117. That is sufficient to comply with our rules. *See* 37 C.F.R. § 42.65(a).

Fourth, Patent Owner argues that "Petitioner fails to rely on Sturman in this or any Ground in the Petition." PO Resp. 25; *see also* PO Sur-reply 12. Patent Owner further argues that "Petitioner and Dr. Zagal

also fail to explain why a [person having ordinary skill in the art] would have been motivated to apply Sturman's specific advertising delivery schemes to Ho's interactive information elements—let alone demonstrate 'a reasonable likelihood of success' in such modification of Ho." PO Resp. 25; *see also* PO Sur-reply 12.

We disagree with Patent Owner's argument. Petitioner does not rely on Sturman for a limitation, but as corroboration for Dr. Zagal's testimony regarding the reason a person having ordinary skill in the art would have combined the relevant teachings of Ho and Aoki. *See* Pet. 24; Pet. Reply 11–12. Because such corroboration evidence is not part of the ground, there is no reason to identify it as such. *See IXI*, 903 F.3d at 1262–63. And, because Petitioner is not relying on Sturman for a limitation, there is no need for Petitioner to argue there was a reason to combine Sturman with Ho and Aoki.

Fifth, in the Sur-reply, Patent Owner argues that "any newly-suggested modification of Aoki to provide the advertisement server with the 'ID of the player' prior to downloading the advertising content would render Aoki inoperable for its intended purpose ('advertisement charge process')." PO Resp. 13 (citing *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)).

We do not agree with Patent Owner's argument. As a preliminary matter, contrary to Patent Owner's statement, Petitioner did not raise a new argument in its Reply. Instead, Petitioner clearly set forth its theory that the combination of Ho and Aoki would result in a method of the client device sending user-identification information to the server prior to the server sending advertisements to the mobile device in the Petition:

> Thus, in the combined Ho-Aoki system the client end device would continue to download from the server interactive

> information elements and hidden content, and would do so after providing the server the ID of the player ("user-identification information") and a game ID ("a game for which hot spot information is desired"). Ex. 1003 ¶ 117. The prior art includes express teachings that would motivate a [person having ordinary skill in the art] to provide the server a user ID and game. *Id.* For instance, a [person having ordinary skill in the art] would have understood and the prior art explains that identification of the user and game would allow the server to provide Ho's mobile device with advertisements that are targeted to specific users and games.

Pet. 24. Because the argument was raised in the Petition, Patent Owner should have fully responded to it in its Response and should not have waited for the Sur-reply to raise it. *See* PO Resp. 21–25 (not raising inoperability or *Gordon*). By not raising the argument in the Response, Patent Owner forfeited it. *See* Paper 10, 9; *In re NuVasive, Inc.*, 842 F.3d 1376, 1381 (Fed. Cir. 2016) (arguments not properly raised in the Patent Owner's Response are forfeited).

Moreover, Patent Owner's argument consists solely of attorney argument. *See* PO Sur-reply13. Patent Owner does not cite to any testimonial or documentary evidence to support its argument. *See id.* It is well settled that mere attorney argument unsupported by factual evidence is entitled no probative value. *See Elbit Systems of America, LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) ("'[a]ttorney argument is not evidence' and cannot rebut other admitted evidence" (quoting *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017)); *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (unsworn attorney argument is not evidence).

Sixth, Patent Owner argues that Petitioner's arguments regarding Massive Incorporated are unsupported. PO Sur-reply 13. Specifically,

Patent Owner argues that although Petitioner argues that "Petitioner's expert explained that prior to the '662 patent, advertisers, such as Massive Incorporated, began partnering with game developers to provide targeted advertisements in video games," the citation discusses the standard for anticipation, not any discussion of Massive Incorporated. *Id.* (citing Pet. Reply 11 (citing Ex. 1003 ¶ 18)).

We agree with Patent Owner that the cited portion of Dr. Zagal's testimony does not support Petitioner's argument. Accordingly, we do not rely on that portion of the argument. *See* Ex. 1003 ¶ 18.

However, Petitioner's Reply also discusses Sturman, a patent application filed by Massive Incorporated:

> Petitioner also relied on a prior art patent assigned to Massive (Ex. 1008, Sturman) that provides an express motivation to combine by explaining that it is desirable for a mobile device to provide a server with user-identification information and the game ID so that the advertisements in the video game can be targeted to the user . . . .

Pet. Reply 11 (citing Ex. 1008 ¶ 55). To the extent Petitioner's arguments are supported by Sturman and Dr. Zagal's testimony on Sturman, we rely on them for the reasons discussed above.

Finally, Patent Owner also challenges Petitioner's arguments regarding Ellis[10] and Chu.[11] PO Sur-reply 14. Because we do not rely on those references, Patent Owner's argument are moot.

---

[10] US 8,825,521 B2, issued Sept. 4, 2014 (Ex. 1009).

[11] US 2006/0111979 A1, published May 25, 2006 (Ex. 1022).

*c) Remaining Undisputed Limitations*

Limitations 1(b), 1(b)(1), and 1(b)(2) recite "downloading hot spot information from the server to the mobile communication device, the hot spot information comprising: 1) hidden content for presenting to the user when the hot spot is activated; and 2) coordinate information." Ex. 1001, 14:53–58. Petitioner argues that Ho teaches limitations 1(b), 1(b)(1), and 1(b)(2). Pet. 25–27. Patent Owner does not separately address these limitations. *See* PO Resp. 10–25.

We agree with Petitioner. Specifically, Ho teaches that "[i]f the interactive information element(s) needs to be changed/renewed, then new interactive information element(s) are sent to the client end device." Ex. 1004, 10:15–19; *see also* Ex. 1003 ¶ 119. Ho further teaches that the interactive information elements include hidden information, such as an advertisement, that is displayed when the hot spot is activated along with coordinate information as to where the information is displayed. *See* Ex. 1003 ¶¶ 120–121; Ex. 1004, 2:11–12, 5:1–16, 5:27–38, 7:17–23, 8:11–21, 9:33–36, Fig. 3.[12]

Limitation 1(c) recites "designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information." Ex. 1001, 14:59–61. Petitioner argues that Ho teaches limitation 1(c). Pet. 28–29. Patent Owner does not separately address this limitation. *See* PO Resp. 10–25.

---

[12] Because Ho teaches the "coordinate information" portion of the limitation, we do not address Petitioner's alternative argument based on Aoki. *See* Pet. 27.

We agree with Petitioner. Specifically, because Ho's interactive information elements are at a location which does not display promotional information until the elements are activated, it is a non-promotional location. Ex. 1003 ¶ 125; Ex. 1004, 5:1–7, 5:27–38, 7:17–23. Additionally, Ho teaches that the location of the interactive information elements and the hidden content uses coordinate information provided by the server. Ex. 1003 ¶ 126; Ex. 1004, 7:17–23, 9:33–36.[13]

Limitation 1(d) recites "displaying an object at the designated non-promotional location." Ex. 1001, 14:62–63. Petitioner argues that Ho teaches limitation 1(d). Pet. 30. Patent Owner does not separately address this limitation. *See* PO Resp. 10–25.

We agree with Petitioner. Specifically, Ho's interactive information elements are objects, such as in-game characters or items. Ex. 1003 ¶ 130; Ex. 1004, 2:11–12, 5:1–7, Fig. 3. Moreover, as discussed above, they are displayed prior to being activated, at a specific non-promotional location. Ex. 1003 ¶ 130.

Limitation 1(e) recites "displaying the hidden content when the user activates the hot spot." Ex. 1001, 14:64–65. Petitioner argues that Ho teaches limitation 1(e). Pet. 30. Patent Owner does not separately address this limitation. *See* PO Resp. 10–25.

We agree with Petitioner. Specifically, Ho teaches that when an interactive information element is activated, the hidden promotional information is displayed. Ex. 1003 ¶ 132; Ex. 1004, 5:27–38.

---

[13] Because Ho teaches the "coordinate information" portion of the limitation, we do not address Petitioner's alternative argument based on Aoki. *See* Pet. 29.

*d) Conclusion Regarding Claim 1*

For the reasons set forth above, Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claim 1 would have been obvious over Ho and Aoki.

*4. Analysis of Claims 2–11 and 13–19*

Petitioner argues that the combination of Ho and Aoki teaches the limitations recited in claims 2–11 and 13–19 and that a person having ordinary skill in the art would have combined the teachings with a reasonable expectation of success. Pet. 30–36. Petitioner's arguments are supported by citations to the prior art and the testimony of Dr. Zagal. *See id.* We have reviewed Petitioner's arguments and evidence, agree with them, and, therefore, adopt Petitioner's arguments and evidence as our own.

Patent Owner does not separately address claims 2–6, 8–11 and 14–19. *See* PO Resp. 25–28. For claim 7, Patent Owner relies on its arguments regarding version identifier, which we addressed in Section II.E.3.b.(2). PO Resp. 26. For claim 13, Patent Owner relies on its arguments regarding user-identification information, which we addressed in Section II.E.3.b.(2). PO Resp. 26–27.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claims 2–11 and 13–19 would have been obvious over Ho and Aoki.

*F. Obviousness Based on Other Grounds*

Petitioner argues that (1) claims 1–20 would have been obvious over Jiau and Aoki, (2) claims 1–11 and 13–19 would have been obvious over Ho Kim, and (3) that claims 1–20 would have been obvious over Jiau and Kim. Pet. 3, 36–57, 59–72. Because we determine that claims 1–11 and 13–19

would have been obvious in light of Ho and Aoki, we do not address the parties' arguments regarding those claims based on these additional grounds. *See Boston Sci. Scimed, Inc. v. Cook Gp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding."). With regard to claims 12 and 20, for the reasons discussed below, Petitioner has not shown by a preponderance of the evidence that those claims are unpatentable as obvious over the combination of either (1) Jiau and Aoki or (2) Jiau and Kim.

*1. Overview of Jiau*

Jiau is titled "Method and Apparatus for Providing Hotspots in a Shared Virtual World" and "relates . . . to a method and apparatus that allow users to access and explore a multi-owner, three-dimensional virtual world in a network environment." Ex. 1006, code (54), 1:7–9.

Jiau describes prior "multi-player games[ whereby] players can [see] representations of each other in the three-dimensional world as they move within some predetermined distance of each other." Ex. 1006, 1:19–21. Jiau generalizes "[s]uch three-dimensional games[ as] involv[ing] a predetermined, predefined virtual world that does not change . . . [—]defined by the game designer and the players move within the predefined spaces." *Id.* at 1:22–24.

Jiau's invention provides "[a] virtual world . . . divided into a plurality of 'lots,' similar to 'lots' of real estate in the real world" and whereby "[u]sers can reserve . . . these lots to design as they please." Ex. 1006, 1:32–2:2. "[U]sers access the virtual world via client data processing systems using a networking model such as the World Wide Web." *Id.* at 2:4–5. "The server assigns each newly registered lot to a location in

the virtual world[,] stores the lots in a memory or database," and thus provides "each lot . . . an ownership attribute." *Id.* at 2:7–9. "Users can alter and modify their lots, even while others are visiting them in the virtual world[;] the lots . . . can be constantly updated and changed." *Id.* at 2:29–31.

"Users can include objects in their lots that allow a virtual person walking in their lots to move to another lot that is not physically contiguous to their lot," e.g., the virtual person "walks into it" for "teleporting." Ex. 1006, 2:13–16. "Users can also define objects in their lots that have certain behaviors, such as playing an ad or animation when selected." *Id.* at 2:19–20. "Users can also associate objects with the URLs of pages on the world wide web, so that a web page is displayed when the object is approached or activated." *Id.* at 2:20–21.

"If the user . . . turn[s and] . . . a new lot is viewed, the client system determines whether it needs to load new lots or objects." Ex. 1006, 11:7–9. "If the user walks into an object or selects an object though a mouse click or similar means . . . , the client system takes various actions . . . depending on how the object is defined." *Id.* at 11:16–18. "This activity is part of the attributes of object 320." *Id.* at 15:7 (citing Fig. 13(b) for such attributes of an attribute). One attribute is that, per a "hotspace link defined around object 320," the "object 320 has a pop-up advertisement 1182 that is activated when the user's location becomes within a predetermined virtual distance in the virtual world." *Id.* at 15:4–8.

"Hot spaces are defined as two or three-dimensioned areas or the virtual world (which may or may not have an object located therein) that have an associated link." Ex. 1006, 15:32–16:2; *see also id.* at 17:1 ("[A] 'hotspace' is a predetermined space surrounding an object."). "For

example, when a user walks within ten virtual feet of a hotspace, a pop-up advertisement may appear." *Id.* at 17:1–2.

"Hot spots are defined as areas of an object (or a whole object) that have an associated link." Ex. 1006, 15:31–32. "For example, when the user touches or selects an object, a pop-up advertisement may appear." *Id.* at 16:31–32.

Figures 11(d) and 11(e) of Jiau are reproduced below.



Fig. 11(d)



Fig. 11(e)

Figure 11(d) illustrates an example of a three-dimensional view of a virtual world having advertisements activated by user actions, and Figure 11(e) illustrates an example of an object having a hotspot allowing a user to enter an interior of the object. Ex. 1006, 5:28–31. In Figure 11(d), an object 320 has a pop-up advertisement 1182 that is activated when the user's location is within a predetermined virtual distance in the virtual world. *Id.* at 15:3–17. When the user approaches object 320, advertisement 1282 pops up. *Id.* This activity is part of the attributes of object 320—there is a hotspace link defined around object 320. *Id.* Figure 11(d) further shows a static object 1184 that is always visible when it comes into view in the three-dimensional representation of the virtual world. *Id.* Object 1184 is a sign containing an

advertisement, and there is a hotspot link 1186 defined on object 1184. *Id.* When the user clicks or otherwise selects hotspot link 1186 (e.g., by approaching it), an animation 1188 (represented in the figure by a star) spins, changes color, or animates. *Id.* Hotspot 1186 and the activity associated with object 1184 (as well as the appearance of object, including the advertising text) are defined as attributes of object 1184. *Id.*

Figure 11(e) shows an object 1192 having a hotspot link 1194 (e.g., a door shape) allowing the user to enter an interior of the object. Ex. 1006, 15:18–16:2. The user enters the interior of the object when the user activates hotspot 1192 (i.e., when the user collides with, or passes sufficiently close to, the hotspot). *Id.* When a user activates hotspot 1194, the user passes to the interior of object 1192, and the client computer renders an interior view of the object. *Id.* Other objects that appear similar to object 1192 may have hotspots that are effectively teleportation links, so that the user steps through a door, but ends up in another location in the virtual world (or in a sub-world, or a related virtual world). *Id.* Hot spots are areas of an object (or a whole object) that have an associated link, and hot spaces are two or three-dimensioned areas that have an associated link. *Id.*

*2. Overview of Kim*

Kim is titled "Advertisement Method Using Game Program on the Internet and Method for Executing the Game Program Having the Advertisement According to the Advertisement Method" and is directed to "a method of advertisement which is applied to a game on the internet." Ex. 1007, code (54), 1:14–16.

*3. Claims 12 and 20*

Claim 12 depends from claim 1 and recites the following additional limitation: "wherein the hidden content comprises a second hot spot." Ex. 1001, 15:25–26. Claim 20 depends from claim 13 and recites the same additional limitation. *Id.* at 16:30–31.

Petitioner argus that Jiau[14] teaches the additional limitation recited in claims 12 and 20. Pet. 55–57, 71, 72 (citing Ex. 1003 ¶¶ 205–206; Ex. 1006, 15:17–31, claims 8–10 (21:27–22:2), Fig. 11(f)). Specifically, Petitioner argues that Jiau teaches that an object may be associated with "a plurality of hotspots" and that each hotspot may be "activated separately" with "different hotspot activities associated therewith." Pet. 55–56 (quoting Ex. 1006, claims 8–10 (21:27–22:2)). Petitioner further argues that Jiau Figure 11(e) teaches an object with a hotspot link 1194 (a door) that, when activated, opens to the interior of the object, shown in Jiau Figure 11(f), which will have a hidden hotspot associated with furniture. *Id.* at 56 (citing Ex. 1006, 15:17–31; Ex. 1003 ¶ 206); *see also* Pet. Reply 20–21.

Dr. Zagal's testimony is substantially the same as Petitioner's argument and is reproduced below in its entirety:

> 205. In my opinion, Jiau discloses and renders obvious the additional limitation of claim 12.
>
> 206. For example, Jiau teaches that an object may be associated with "a plurality of hot spots" (Ex. 1006, Claim 8) and that each hot spot may be "activated separately" with "different hotspot activities associated therewith" (*id.*, Claims 9–10). For instance, Jiau discloses that "Fig. 11(e) shows an example of an object 1192 have a hotspot link 1194 (e.g., a door-shape)."

[14] For both the (1) Jiau and Aoki and (2) Jiau and Kim grounds, Petitioner relies only on Jiau for the additional element recited in claims 12 and 20. Pet. 36–57, 59–72. Accordingly, we do not address Aoki or Kim.

> Ex. 1006, 15:17-31. When a user activates the hotspot, for instance "when he collides with or passes sufficiently close to the hotspot," hidden content may be displayed, such as the "interior of object 1192" that is shown in Figure 11(f). *Id.* The hidden content, for instance, the furniture in the building interior (yellow) may comprise additional hot spots which are similarly activated when a user "collides with or passes sufficiently close" to them.

Ez. 1003 ¶¶ 205–206. Dr. Zagal testimony also includes a partially colorized version of Jiau Figure 11(f), reproduced below.




Ex. 1003 ¶ 206. Jiau Figure 11(f) "shows an example of an interior of the object of Fig. 11(e)." Ex. 1006, 5:32. Dr. Zagal had colored the two pieces of furniture yellow. Ex. 1003 ¶ 206.

We are not persuaded by Petitioner's argument. First, the cited language in the Jiau's claims does not support Petitioner's argument and Dr. Zagal's opinion that Jiau's hotspots contain hidden content that is itself a hotspot. Although Jiau claim 8 refers to an "object [having] a plurality of hotspots," nothing in Jiau claim 8 teaches or suggests a hotspot having hidden content that is a hotspot. *See* Ex. 1006, 21:27; Ex. 2006 ¶ 103. Rather, it simply describes an object having multiple hotspots, such as a

door and a button. Ex. 2006 ¶¶ 102–103. For example, Jiau describes how a hotspot can be the entirety of an object (Ex. 1006, 3:27–31) or a portion of an object, such as Jiau Figure 11(d) showing hotspot link (object 1186) taking up only a portion of object 1184 (*id.* at Fig. 11(d), 15:10–17). *See also* Ex. 2006 ¶ 102.

Similarly, nothing in Jiau claims 9 and 10 indicates the presence of a hotspot containing hidden content that is itself a hotspot. Instead, the claims simply describe how an object having more than one hotspot can have the hotspots activated by different actions or activated separately. Ex. 1006, 21:29–22:2; Ex. 2006 ¶ 103. For example, Jiau describes how hotspots can be activated by either being in a certain location or performing a specific action, such as touching or selecting an object. Ex. 1006, 15:9–17, 16:30–32; Ex. 2006 ¶ 103. There is nothing in the claim language that teaches or suggests a hotspot having hidden content that is a hotspot as recited in claim 12. *See* Ex. 2006 ¶ 103.

Second, Jiau Figures 11(e) and 11(f) and the corresponding section of the specification do not support Petitioner's argument. Jiau describes Figures 11(e) and 11(f) as follows:

> Fig. 11(e) shows an example of an object 1192 having an hotspot link 1194 (e.g., a door-shape) allowing a user to enter an interior of the object. In the example, the user enters the interior of the object when he activates the hotspot 1192 (i.e., when he collides with or passes sufficiently close to the hotspot). Fig. 11(f) shows an example of an interior of object 1192 of Fig. 11(e). When a user activates hotspot 1194 of Fig. 11(e), the user passes to the interior of object 1192 and client computer 106 renders an interior view of the object. The interior view of Fig. 11(f) is preferably defined as an attribute of object 1192. In the example, the interior of object 1192 is the same size as its exterior, although this does not have to be the case. If the interior

> and exterior are different sizes, a sub-coordinate system is used for the interior of the object. In the example, if the user turns around in the interior of the object, he will see the inside walls of the object. Other objects that appear similar to object 1192 can have hotspots that are effectively teleportation links, so that the user steps through a door, but ends up in another location in the virtual world (or in a sub world or a related virtual world).

Ex. 1006, 15:18–31. Nothing in Jiau's specification indicates that the pieces of furniture shown in Jiau Figure 11(f) are either objects or have hotspots associated with them. *See id.*; Ex. 2006 ¶ 106. Indeed, the specification is silent about the furniture and Jiau Figure 11(f) does not contain any item identification numbers pointing to the furniture. Ex. 1006, 15:18–31, Fig. 11(f).

Other portions of the specification are similarly silent about there being hotspots inside the interior of an object. The specification describes different types of objects: "solid objects," "objects with interior," "object with pass-through," "object with associated action," "teleportation object," and "URL object." Ex. 1006, 11:19–20:12. With regard to "object with interior" such as the building in Figure 11(e) (object 1192) the specification states:

> 2) object with interior - walking into this type of object will cause the user to view a completely different view representing the interior of the object (e.g., walking through a doorway). This type of object has a link to its interior. This movement can also be a teleportation to a completely different location in the virtual world, as described below. Some objects have interiors that are the same size as their exteriors. Some objects have interiors that are larger or smaller than their exteriors. These objects will use a sub-coordinate system for locations within their exteriors.

*Id.* at 11:21–28. Although the specification describes entering the object, there is no discussion of anything in the interior being a hotspot. *See id.*

Third, the following testimony from Dr. Zagal is not credible: "The hidden content, for instance, the furniture in the building interior (yellow) may comprise additional hot spots which are similarly activated when a user 'collides with or passes sufficiently close' to them." Ex. 1003 ¶ 206. Although Dr. Zagal cites to Jiau's specification (Ex. 1006 15:17–31), as discussed above, we do not find support for his opinion that the furniture comprises an additional hotspot. Dr. Zagal and Petitioner attempt to make a logical leap, but do not sufficiently explain why it is so. That is not sufficient to meet Petitioner's burden to demonstrate unpatentability by a preponderance of the evidence.

In reaching this determination, we are bound by the theory set forth in the Petition. *See SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 363 (2018) ("[I]n an *inter partes* review the petitioner is master of its complaint. . . . [I]t's the petitioner, not the Director, who gets to define the contours of the proceeding."). Petitioner does not argue that it would have been obvious to a person having ordinary skill in the art to modify Jiau to add a hot spot (hidden content) to an activated hot spot (hidden material), such as the interior of a building. *See* Pet. 55–56. That is, the Petition lacks any argument as to why a person having ordinary skill in the art would modify Jiau. *See id.* Instead, the Petition is limited to an argument that Jiau has that feature. *See id.* We limit ourselves to that argument, and find it lacking.

Accordingly, Petitioner has not shown by a preponderance of the evidence that the combination Jiau with either Aoki or Kim teaches the additional limitation recited in claims 12 and 20.

## III. CONCLUSION[15]

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1–11 and 13–19 of the ’662 patent. Specifically, Petitioner has shown by a preponderance of the evidence that claims 1–11 and 13–19 would have been obvious under 35 U.S.C. § 103(a) in view of Ho and Aoki. Petitioner has not shown by a preponderance of the evidence that claims 12 and 20 would have been unpatentable in view of either (1) Jiau and Aoki or (2) Jiau and Kim.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–11, 13–19 | 103(a) | Ho, Aoki | 1–11, 13–19 | |
| 1–20 | 103(a) | Jiau, Aoki[16] | | 12, 20 |

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[16] As explained above, because we determine that claims 1–11 and 13–19 are unpatentable as obvious over Ho and Aoki, we decline to address those claims on this ground.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–11, 13–19 | 103(a) | Ho, Kim[17] | | |
| 1–20 | 103(a) | Jiau, Kim[18] | | 12, 20 |
| **Overall Outcome** | | | 1–11, 13–19 | 12, 20 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, Petitioner has shown by a preponderance of the evidence that claims 1–11 and 13–19 of the ’662 patent are unpatentable; and

FURTHER ORDERED that, Petitioner has not shown by a preponderance of the evidence that claims 12 and 20 of the ’662 patent are unpatentable;

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

[17] As explained above, because we determine that claims 1–11 and 13–19 are unpatentable as obvious over Ho and Aoki, we decline to address those claims on this ground.

[18] As explained above, because we determine that claims 1–11 and 13–19 are unpatentable as obvious over Ho and Aoki, we decline to address those claims on this ground.

Trials@uspto.gov
571-272-7822

Paper 28
Date: April 24, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

PLR WORLDWIDE SALES LTD.,
Petitioner,

v.

FLIP PHONE GAMES, INC.,
Patent Owner.

---

IPR2024-00209
Patent 9,427,662 B2

---

Before DAVID C. MCKONE, DANIEL J. GALLIGAN, and SCOTT B. HOWARD, *Administrative Patent Judges*.

GALLIGAN, *Administrative Patent Judge*, Concurring in Part and Dissenting in Part.

I concur that claims 1–11 and 13–19 are unpatentable and join all of the majority's decision in that regard. I respectfully disagree, however, with the majority's finding in Section II.F.3 that Petitioner has not shown by a preponderance of the evidence that Jiau teaches the additional limitation recited in claims 12 and 20 that "the hidden content comprises a second hot spot."

Jiau's Figure 11(f) is reproduced below.




Fig. 11(f)

Jiau's Figure 11(f) above "shows an example of an interior of object 1192 of Fig. 11(e)" that appears "[w]hen a user activates hotspot 1194 of Fig. 11(e)." Ex. 1006, 15:21–23. Figure 11(f) shows two benches (furniture).

Petitioner's contention is that the interior of object 1192, which Petitioner maps to the recited "hidden content," "may comprise additional hotspots associated with the furniture (yellow) in the building interior that are activated when a user 'collides with or passes sufficiently close' to them." Pet. 56 (quoting Ex. 1006, 15:19–21). I find this contention persuasive based on Jiau's teachings.

Jiau discloses various examples of objects, such as "solid objects," "objects with interior," "object with pass-through," "object with associated action," "teleportation object," and "URL object," and Jiau specifies what happens when interactions with these objects occur. Ex. 1006, 11:19–20:12. For example, walking into a solid object "will cause the user to stop (this type of object does not have links to any other object or lot)." Ex. 1006, 11:19–20. Thus, a solid object would not have a hot spot. Walking to an "object with associated action," however, "will cause the user to view an action, such as a pop-up ad or an animation." Ex. 1006, 12:1–2. Thus, an "object with associated action" would have a hot spot.

I would find that Jiau's inclusion of benches within the interior of object 1192 suggests, at the very least, that they are objects. *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) ("[A] reference must be considered not only for what it expressly teaches, but also for what it fairly suggests." (quotations and citation omitted)). I further find persuasive Petitioner's contention and Dr. Zagal's testimony that the furniture "may" have hot spots (Pet. 56; Ex. 1003 ¶ 206) because it is consistent with Jiau's disclosure that certain types of objects have hot spots. Ex. 1006, 11:19–20:12. I believe this reading of Jiau is consistent with Jiau's overall teachings of "allow[ing] users to explore and interact in a multi-owner, three-dimensional virtual world." Ex. 1006, 1:31–32. Although a game implemented according to the teachings of Jiau *could* have the user enter a blank room with no further functionality, I believe a reasonable reading of Jiau fairly suggests to a person of ordinary skill in the art including functionality via the disclosed objects in spaces encountered by the user. *See* Ex. 1006, 11:16–18 ("If the user walks into an object or selects an object

though a mouse click or similar means (step 216), the client system takes various actions (step 224), depending on how the object is defined.").

Although Jiau does not expressly describe the benches in Figure 11(f) as "objects," I would not expect Jiau or any reference to belabor all of the possibilities associated with every item in a figure once the reference had laid out those possibilities in detail, as Jiau does by specifying types of objects and associated actions.

PETITIONER:

James Glass
Nima Hefazi
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
nimahefazi@quinnemanuel.com

PATENT OWNER:

Michael Morlock
Joshua Lee
Andrew Rinehart
Kasey Koballa
KILPATRICK TOWNSEND & STOCKTON LLP
mmorlock@kilpatricktownsend.com
jlee@kilpatricktownsend.com
arinehart@kilpatricktownsend.com
kkoballa@kilpatricktownsend.com

US009427662B2

(12) United States Patent
Hartwell

(10) Patent No.: US 9,427,662 B2
(45) Date of Patent: *Aug. 30, 2016

(54) **METHODS AND SYSTEMS FOR PROVIDING IN-GAME HOT SPOTS**

(71) Applicant: **GOSUB 60, Inc.**, Santa Monica, CA (US)

(72) Inventor: **Joshua Hartwell**, Santa Monica, CA (US)

(73) Assignee: **GOSUB 60, INC.**, Santa Monica, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 65 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/180,890**

(22) Filed: **Feb. 14, 2014**

(65) **Prior Publication Data**

US 2014/0162784 A1 Jun. 12, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 11/768,890, filed on Jun. 26, 2007, now Pat. No. 8,688,089.

(51) **Int. Cl.**

| | |
|---|---|
| ***A63F 13/12*** | (2006.01) |
| ***A63F 13/30*** | (2014.01) |
| ***H04W 4/02*** | (2009.01) |
| ***H04L 29/08*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |

(52) **U.S. Cl.**

CPC ............... ***A63F 13/12*** (2013.01); ***H04L 67/04*** (2013.01); ***H04L 67/18*** (2013.01); ***H04L 67/20*** (2013.01); ***H04L 67/38*** (2013.01); ***H04W 4/02*** (2013.01)

(58) **Field of Classification Search**

CPC ........................................................ A63F 13/12

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,219,696 | B1 | 4/2001 | Wynblatt et al. |
| 6,445,398 | B1 | 9/2002 | Gerba et al. |
| 6,628,939 | B2 | 9/2003 | Paulsen |
| 7,158,798 | B2 | 1/2007 | Lee et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1087312 A2 3/2001

OTHER PUBLICATIONS

Advisory Action for U.S. Appl. No. 11/76 ,890, mailed Nov. 22, 2011 (3 pages).

(Continued)

*Primary Examiner* — Omkar Deodhar

(74) *Attorney, Agent, or Firm* — Finnegan, Henderson, Farabow, Garrett & Dunner, LLP

(57) **ABSTRACT**

Systems and methods for providing hot spots for mobile video games on mobile communication devices that receive hot spot information for mobile video games that operate on the devices. The hot spots may be hidden aspects of the game and promotional in nature, allowing game companies to generate extra revenue through selling non-permanent advertisement space to third parties. The game may contain instructions that cause the mobile communication device to contact an interface and/or server to receive hot spot information. After the hot spot information is received by the mobile communication device, the content may be displayed in-game. In addition, the server may track what hot spot information has already been received by the mobile communication device.

**20 Claims, 7 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,575,518 | B2 | 8/2009 | Tabata |
| 7,577,978 | B1 | 8/2009 | Wistendahl et al. |
| 7,753,791 | B2 | 7/2010 | Hartwell |
| 8,246,466 | B2 | 8/2012 | Herrmann et al. |
| 8,401,903 | B2 | 3/2013 | Lerman et al. |
| 8,688,089 | B2 | 4/2014 | Hartwell |
| 2002/0166119 | A1 | 11/2002 | Cristofalo |
| 2003/0105669 | A1 | 6/2003 | Tsuchiya |
| 2003/0224855 | A1 | 12/2003 | Cunningham |
| 2004/0049419 | A1 | 3/2004 | Knight |
| 2004/0127279 | A1 | 7/2004 | Gatto et al. |
| 2005/0240476 | A1 | 10/2005 | Bigott |
| 2006/0111979 | A1 | 5/2006 | Chu |
| 2006/0128469 | A1 | 6/2006 | Willis et al. |
| 2006/0130046 | A1 | 6/2006 | O'Neill |
| 2006/0136297 | A1 | 6/2006 | Willis et al. |
| 2006/0205510 | A1 | 9/2006 | Lauper et al. |
| 2007/0022442 | A1 | 1/2007 | Gil et al. |
| 2007/0242645 | A1 | 10/2007 | Stephenson et al. |
| 2008/0102956 | A1 | 5/2008 | Burman et al. |
| 2008/0109528 | A1 | 5/2008 | Knight et al. |
| 2009/0007186 | A1 | 1/2009 | Hartwell |
| 2009/0156179 | A1 | 6/2009 | Hahn et al. |
| 2010/0291907 | A1 | 11/2010 | Macnaughtan et al. |
| 2013/0282454 | A1 | 10/2013 | Alpert et al. |

OTHER PUBLICATIONS

Final Office Action for U.S. Appl. No. 11/768,890, mailed Aug. 2, 2011 (12 pages).
Final Office Action for U.S. Appl. No. 11/768,892, mailed Jun. 5, 2013 (8 pages).
International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US08/68249; International Filing Date Jun. 25, 2008 (8 pages).
International Search Report and the Written Opinion of the International Searching Authority, or the Declaration; International Application No. PCT/US08/68250; International Filing Date Jun. 25, 2008 (8 pages).
Notice of Allowance for U.S. Appl. No. 11/768,890, mailed Nov. 14, 2013 (9 pages).
Notice of Panel Decision from Pre-Appeal Brief Review for U.S. Appl. No. 11/768,892, mailed Oct. 22, 2013 (2 pages).
Office Action for U.S. Appl. No. 11/768,890, mailed May 6, 2010 (8 pages).
Office Action for U.S. Appl. No. 11/768,890, mailed Sep. 30, 2010 (8 pages).
Office Action for U.S. Appl. No. 11/768,890, mailed Feb. 2, 2011 (9 pages).
Office Action for U.S. Appl. No. 11/768,890, mailed Mar. 13, 2013 (9 pages).
Office Action for U.S. Appl. No. 11/768,892, mailed Sep. 10, 2012 (8 pages).
Office Action for U.S. Appl. No. 11/768,892, mailed Jan. 4, 2013 (6 pages).
Office Action for U.S. Appl. No. 11/768,892, mailed Mar. 25, 2014 (9 pages).
PCT Notification Concerning Transmittal of International Preliminary Report on Patentability; International Application No. PCT/US2008/068250; Jan. 14, 2010 (7 pages).
PCT Notification Concerning Transmittal of International Preliminary Report on Patentability; International Application No. PCT/US2008/068249; Jan. 14, 2010 (6 pages).
U.S. Appl. No. 11/768,892, filed Jun. 26, 2007.


125
DISTRIBUTION
105
110
115
122
NETWORK
120
SERVER
130
150
CREATION
140

FIG. 1




FIG. 2A




FIG. 2B


OPERATE THE VIDEO GAME
305
CONTACT SERVER TO CHECK FOR HOT SPOT INFORMATION
310
DOWNLOAD THE HOT SPOT INFORMATION TO THE COMMUNICATIONS DEVICE
320
DESIGNATE A LOCATION IN-GAME AS ASSOCIATED WITH ACTIVATING THE HOT SPOT
330
DISPLAY CONTENT WHEN THE USER ACTIVATES THE HOT SPOT
340

FIG. 3A


305
OPERATE VIDEO GAME
306
USER REQUESTS HOT SPOT UPDATE
307
INITIAL STARTUP
309
PERIODIC UPDATE OF HOT SPOT INFORMATION
310
CONTACT SERVER TO CHECK FOR HOT SPOT INFORMATION
315
HOT SPOT INFORMATION ALLOWED?
YES
312
RECEIVE INITIAL MESSAGE FROM SERVER
317
FOLLOW-UP REQUEST SENT TO SERVER
320
DOWNLOAD HOT SPOT INFORMATION TO THE MOBILE COMMUNICATION DEVICE
325
SAVE VERSION IDENTIFIER
328
DISPLAY FEATURES OF THE DOWNLOADED HOT SPOT INFORMATION TO THE USER
330
USE COORDINATE INFORMATION TO DESIGNATE A LOCATION IN-GAME FOR ACTIVATING THE HOT SPOT
335
DISPLAY DESIGNATED ITEM
337
DETECT USER MANIPULATION OF DESIGNATED LOCATION
339
USER ACTIVATES HOT SPOT
340
CONTENT PRESENTED TO USER
342
MESSAGE PRESENTED TO USER

FIG. 3B


410
STORE HOT SPOT INFORMATION ON A COMPUTER-READABLE MEDIUM
430
RECEIVE A REQUEST FROM A MOBILE COMMUNICATION DEVICE FOR HOT SPOT INFORMATION
450
UPLOAD THE HOT SPOT INFORMATION TO THE MOBILE COMMUNICATIONS DEVICE

*FIG. 4A*


STORE HOT SPOT INFORMATION IN A STORAGE MEDIUM
410
INTERFACE RECEIVES A REQUEST FOR HOT SPOT INFORMATION FROM THE COMMUNICATIONS DEVICE
420
HOT SPOT INFORMATION ALLOWED?
425
YES
SERVER RECEIVES REQUEST
430
DETERMINE WHAT HOT SPOT INFORMATION TO SEND
440
SEND HOT SPOT INFORMATION TO THE MOBILE COMMUNICATIONS DEVICE
450
CONFIRMATION OF SUCCESFUL TRANSACTION RECEIVED
460

FIG. 4B

# METHODS AND SYSTEMS FOR PROVIDING IN-GAME HOT SPOTS

This application is a continuation of U.S. application Ser. No. 11/768,890, filed Jun. 26, 2007, which is hereby incorporated by reference herein in its entirety.

## DESCRIPTION OF THE INVENTION

1. Field of the Invention

The invention relates generally to systems and methods for providing in-game hot spots to a mobile communication device.

2. Background of the Invention

Many mobile communication devices (including cellular phones, PDAs, and other handheld devices capable of communicating with a server) are capable of operating video games. Most current mobile communication devices come equipped with one or more games at the time of purchase, and most modern mobile communication devices also allow users to download and/or purchase new games. As mobile communication device technology has advanced, the games available for these devices have become more robust. For example, most current mobile communication devices include color screens that can support games with detailed color graphics, and more content may generally fit onto these screens than on screens of older mobile devices. As a result, gaming on mobile communication devices has become a popular mode of entertainment in a mobile environment.

However, all video games tend to have a popularity life span. As game elements become increasingly familiar to players, the game may hold less surprises and/or no longer present a challenge to the user, at which point the user may stop playing that particular game in favor of others. Because mobile communication devices are generally less powerful than personal computers and stand-alone video game consoles, some games for mobile communication devices may be relatively simple or repetitive by comparison. Typically, games that hold user interest for longer periods of time are more valuable than games that users leave behind quickly. As a result, game creators are always looking for ways to make games that hold the user's interest for a longer period of time.

The recent surge in technical capabilities of mobile communication devices has also spawned attractive new promotional possibilities. Because an extremely large number of people worldwide own mobile communication devices, many third parties may wish to advertise within the screen of a mobile communication device. In particular, when a user plays a game on the mobile communication device, the user's full attention may be directed to the screen of the mobile communication device. Therefore, providing in-game advertising space in the palm of the user's hand is an attractive proposition for both buyers and sellers of the space.

Permanent advertisements within a video game that is played on a mobile communication device may be presented in various ways. For example, the background of the video game might contain a permanent advertisement for a third party. In most cases, this advertisement would generate revenue for the maker of the game, while also serving as a valuable promotional opportunity for the third party.

It is accordingly an object of the invention to provide systems and methods for providing hot spots of triggered content within the gaming environment of a mobile video game on a mobile communication device. A hot spot can be



thought of as a location or item, sometimes hidden within the game, that triggers additional specialized content when activated by a user or some other in-game element. Some embodiments may prolong user interest in a game for a mobile communication device, and make promotional opportunities more predictable and/or desirable, as follows.

## SUMMARY OF THE INVENTION

In accordance with embodiments of the invention, systems and methods for providing in-game hot spots on a mobile communication device are provided.

In an embodiment, a mobile communication device may comprise a screen for viewing by the user, a processor, and a memory. The memory may contain instructions that, when executed by the processor, cause the communications device to operate a video game, contact a remote system to check for hot spot information to use in the video game, download the hot spot information to the communications device from a server, designate a location in-game for activating the hot spot, detect manipulation of the designated location as activating the hot spot; and display content when the user activates the hot spot. The video game itself may be presented on the screen.

A hot spot is an in-game feature that includes an activation element and a content element that is triggered by the activation element. The downloaded hot spot information may include one or both of the elements. The mobile communication device may update the hot spot information periodically by contacting the remote system.

The activation element may comprise an area location or an item, sometimes hidden in the game, that can be triggered by a user or some other in-game element. For example, the hot spot information may include coordinate information, and the coordinate information may be used to designate the location for activating the hot spot. In some embodiments, the designated location is an item that is displayed in-game.

In some embodiments, the hot spot information identifies the content (i.e., "content element") to be displayed when the hot spot is activated. The content may include, for example, a message, and the message may be promotional. In some embodiments, the message includes a hint related to the game. Other content that can be triggered by a hot spot includes a new game level or an item useful in playing the game. The content triggered by a first hot spot can also include another hot spot that is then placed within the game. The content may be promotional in nature, but can also be non-promotional.

Another embodiment disclosed herein includes a computer-readable medium containing instructions for execution by a mobile communication device. The instructions may cause the mobile communication device to operate a video game, contact a server to check for hot spot information for use in the video game, download the hot spot information to the communications device, designate a location in-game for activating the hot spot, detect manipulation of the designated location as activating the hot spot, and display content when the user activates the hot spot.

A method for distributing hot spot information to a communications device for use in a video game that runs on the communications device is disclosed herein. In an embodiment, the method may comprise the steps of storing hot spot information on a computer-readable medium, receiving a request for hot spot information from a mobile communication device, the hot spot information being usable in a video-game that already exists on the communications device, and uploading hot spot information to the

communications device, the hot spot information identifying content for presenting to the user when the hot spot is activated.

The hot spot information may designate a location in-game for activating the hot spot. In one case, the location may be fixed to a particular item, and therefore may be subject to the movement and/or boundaries of the item.

In addition, the method may include tracking what hot spot information has been downloaded.

Further, some embodiments may include a system for distributing updated video game content to a communications device. The system may comprise a storage medium for storing hot spot information for use in a video game, a server in communication with the storage medium, and an interface coupled to the server and a network, wherein the interface receives a request for hot spot information from the communications device over the network. In some systems, the server may be operative to receive a request through the interface and utilize the request to send the hot spot information from the storage medium to the communications device, the hot spot information designating an location in-game as associated with activating the hot spot.

The hot spot information may identify content for presenting to the user when the hot spot is activated, and the content may be promotional in nature. In some embodiments, the content is pre-selected by the server based on a model type associated with the communications device, a service subscription associated with the communications device, or a service provider for the service subscription associated with the communications device.

The server may track what hot spot information has been downloaded.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention, as claimed.

The accompanying drawings, which are incorporated in and constitute a part of this specification, illustrate several embodiments of the invention and together with the description, serve to explain the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an overview diagram of exemplary components used to provide in-game hot spots on a mobile communication device in accordance with some embodiments of the present invention.

FIGS. **2**A-B are diagrams of an exemplary scene in a video game played on a mobile communication device in accordance with some embodiments of the present invention.

FIGS. **3**A-B are exemplary flow charts that include steps taken by a mobile communication device to update in-game hot spot information in accordance with an embodiment of the present invention.

FIGS. **4**A-B are exemplary flow charts that include steps taken by a server to update in-game hot spot information on a mobile communication device in accordance with an embodiment of the present invention.

## DESCRIPTION OF THE EMBODIMENTS

Reference will now be made in detail to the present exemplary embodiments of the invention, examples of which are illustrated in the accompanying drawings. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

It is to be understood that both the foregoing background description and the following detailed description are exemplary and explanatory only and are not restrictive of the invention as claimed.

As used herein, a server includes any remote system capable of receiving communication from a handheld device over a network, such as the Internet, intranet, local area network, telecommunications network, and/or Ethernet.

This application incorporates by reference herein in its entirety the U.S. patent application entitled "Systems and Methods for Updating In-Game Content," filed on Jun. 26, 2007, as U.S. application Ser. No. 11/768,892.

Generally, a hot spot is an in-game feature that includes an activation element and a content element that is triggered by the activation element. Hot spot information may include information that allows a mobile communication device to designate a location in-game (such as an item or hidden area) for activating the hot spot. When the location is electronically manipulated in some way during game play, such as by touching it, running over it, hitting it with an item, etc., the content associated with the hot spot may be displayed. For example, the content may be a promotional message.

An embodiment of the invention described below allows a game company and/or provider to provide hot spots via hot spot information to a mobile communication device for use in a mobile video game that operates on the mobile communication device. The ability to provide hot spots and update in-game hot spot information may allow game companies to keep game elements fresh and prolong user enjoyment of the game. For example, new interactive items and/or hidden features may be placed within a particular scene in the game so that the user has something new to look at or trigger (sometimes unexpectedly). In addition, the game company may charge third-party advertisers a fee per downloaded and/or activated hot spot in one aspect. Consequently, the game may sustain its popularity and be more profitable for the game creator than existing mobile communication device games.

The game may also attract more third-party advertisers by providing an avenue for purchasing and selling time blocks of in-game advertising. Third parties may now have the option to advertise for a period of time, rather than permanently, within a video game for a mobile communication device. This flexibility may allow the negotiation of promotional contracts that involve less guess-work with respect to placing advertisements or virtual products within a video game on a mobile communication device. Further, an embodiment herein also provides promotional opportunities for third parties that could not previously afford to place advertisements within a game for a mobile communication device. For example, while purchasing a promotional spot that lasts the lifetime of the game may not be feasible, it may be much cheaper to purchase a smaller block of time for content used in a hot spot over that smaller block of time.

In some embodiments, advertisements may be tracked on a per-view or per-download basis. In these embodiments, it may be possible for the game company and/or distributor to profit each time a promotional hot spot is downloaded. Some embodiments may track each time a hot spot is activated and/or viewed. In one aspect, a mobile communications device may maintain a continuous link with a remote system while the game is operating, allowing the system to track the number of times a hot spot is activated. In another embodiment, no continuous link exists, but the mobile communication device may periodically report hot spot activation statistics to the remote system.

In addition, local third party advertisers may be able to place promotional content on mobile communication devices located within a proximity to the locality.

The ability to place or update a hot spot within the game may also provide an avenue for signing additional promotional contracts after the game has already been publicly released. For example, in a previously-released game, a new hot spot location may be placed in-game (i.e., as part of the gaming environment of the mobile video game) that was not present at the time of the game's launch. Alternatively, an item and/or message associated with an existing hot spot may be changed. Similarly, the location of a hot spot may vary, maintaining an element of surprise or newness within the game. The ongoing promotional aspects of such a system could be very attractive to both buyers and sellers of promotional space.

FIG. **1** is an overview diagram of exemplary components used to place or update hot spot information on a mobile communication device in accordance with several embodiments of the present invention. Turning to FIG. **1**, both a distribution block **125** and a creation block **140** are shown. In the distribution block **125**, the user **105** plays a mobile video game on mobile communication device **110**. In some embodiments, the game includes instructions to check **115** for hot spot information at server **120**. The mobile communication device may perform this check **115** by connecting to server **120** through network **122**.

In some embodiments, the mobile communication device **110** may contain a processor and a memory. The program instructions for the video game may be located in the memory and executed by the processor, causing the game to operate on the mobile communication device. The mobile communication device may also contain a screen for displaying the mobile video game to the user **105**.

The network **122** may include, for example, the global Internet. Alternatively or in addition, the network **122** may include a phone or data network. In an embodiment, the mobile communication device **110** may connect to an interface (not shown) that may, in turn, pass a request for hot spot information to server **120**. The interface may be part of server **120** or a separate device, depending on the embodiment. The interface may also include its own server and/or specialized firewall hardware. In addition, server **120** may actually be one or more servers.

In the example of FIG. **1**, hot spot information is stored on a data storage medium **130**. In this example, the data storage medium **130** is computer-readable. Potential data storage mediums include a hard drive, memory (such as RAM), and other storage devices (e.g., flash memory, a USB drive, compact disk, DVD, tape, or other media). The data storage medium may be implemented by one or more distinct storage mediums. In some embodiments, the hot spot information may be organized or indexed by a database. The storage medium **130** may be a part of server **120** in some embodiments.

After server **120** receives a communication request from mobile communication device **110**, server **120** may check whether hot spot information (or updated hot spot information) is available for one or more mobile video games. If any hot spot information is available, server **120** may send or provide (e.g., upload) the information to mobile communication device **110**. Other steps, such as performing a check of whether the user wishes to receive hot spot information, are possible in some embodiments. For example, the server **120** may store an indicator of whether hot spot information should be sent to the particular mobile communication device **110**. Additionally, before or after the hot spot information is downloaded, the user **105** may be prompted by mobile communication device **110** to make sure the user **105** wishes to add the hot spot information to the video game.



Other user information may also be utilized, such as the sex, age, or interests of the user. This may help in selecting more appropriate hot spot content for the user. Other checks are also possible, such as the geographic location of the user. In one embodiment, the user may be queried for this information. In another embodiment, the mobile communications device automatically transmits the information to the remote system and/or the remote system stores the information for later use.

Once the hot spot information has been downloaded by mobile communication device **110**, the hot spot may be placed in-game (e.g., within the gaming environment). Some hot spots may be initially part of the mobile video games, and hot spot information may replace or supplement previously existing hot spots within the game. For example, the updated hot spot information may change the location of the hot spot, associate the hot spot with a new item, change the content that is displayed when the hot spot is activated, and/or change the method of activating the hot spot.

The hot spot information may be loaded into the server **120** and/or storage medium **130** from any number of external sources (although typical server access restrictions may apply). In FIG. **1**, computer **140** may upload the hot spot information to the server **120**. In other embodiments, the hot spot information may be created on server **120**. In still other embodiments, a user **105** may create a component of the hot spot information. For example, some embodiments may allow the user **110** to upload a recorded message to server **120**, either via the mobile communication device **110** or some other device, such as a personal computer. The message may play, for example, when a hot spot is activated. In another embodiment, the user **110** may be able to upload content (such as a picture, movie, text, etc.) to server **120** for sharing with others. Server **120** may distribute user-generated content as part of hot spot information, for example, if the user wins a contest.

The server may be in communication with the storage medium that contains the hot spot information so that the information may be retrieved and sent to the mobile communication device.

FIGS. **2**A and B are diagrams of an exemplary scene in a mobile video game played on a mobile communication device in accordance with several embodiments. The exemplary screen is from a darts game, which includes dart board **210**. However, embodiments disclosed herein may benefit all types of mobile communication device games, and are not limited to darts games or any other particular type of game that is available for mobile communication devices.

Turning now to FIG. **2**A, several items **210**, **220**, **225**, **230**, and **235** are shown within scene **200**. In this example, virtually any of these items may be defined as hot spots on the mobile communication device. For instance, if the user throws a dart that hits shirt **230**, a promotional message associated with third party X may pop up on screen. A message may include a picture, text, video, audio, or combination thereof. Promotional messages might also be displayed if the user activates hot spots on poster **225** or chalk board **220**. Additionally, if the user activates a hot spot defining a piece of chalk **232**, a new message might be drawn on chalk board **220**.

Thus, hot spots may be provided by designating a location in-game for activating the hot spot, detecting activation of the hot spot during operation of the mobile video game, and displaying content when the hot spot is activated. The

designated in-game location for the hot spot may be based on hot spot information. The activation may occur, for example, when the user manipulates the designated location.

New hot spot information availability may be driven by promotional contract terms, such as with third parties exemplified by X, Y, and Z. In this example, when the promotional contract with third party X ends, the logo on shirt **230** and/or associated hot spot message may be removed. In addition, the mobile communication device may update hot spot information by downloading a new message to associate with the shirt **230**. The updated message may not be promotional, or it may advertise the in-game availability for promotional content. As an example, the new message displayed when the hot spot on shirt **220** is activated might state that "ad space is available." Localized promotional content used on the hot spot may removed and/or replaced in a shorter time frame if the mobile communication device enters a new local area with different localized promotional content in some embodiments. The content may also include content provided by a friend of the user, or may be geographically selected.

Turning to FIG. **2**B, a hot spot may be assigned to window **222**. When the user hits the window with a dart, the hot spot may be activated. Activation may cause the mobile communication device to display content, such as an animation of window **222** shattering. Additionally, a promotional message, such as for a window repair company, may be displayed to the user. In this example, the hot spot information may include coordinates for defining the placement and/or boundaries of the window, the window graphic, the shatter animation content, coordinates for displaying the animation, and the promotional message. In some embodiments, some of those components may already exist on the mobile communication device.

FIGS. **3**A-B are exemplary flow charts that include steps taken by a mobile communication device to update hot spot information in accordance with an embodiment of the present invention. Turning to FIG. **3**A, the mobile communication device operates a video game at step **305**. The video game may be any type of game operable on a mobile communication device.

At step **310**, the mobile communication device may contact a server to check for hot spot information to download in one embodiment. As will be explained in more detail with reference to FIG. **3**B, contacting the server may be triggered by many different events and occur and occur at many different times, depending on the embodiment. The mobile video game may be concurrently operating in some embodiments, or not operating in other embodiments.

After the server has been contacted, the mobile communication device may begin downloading the hot spot information at step **320**. The length of time that passes between contacting the server at **310** and downloading the updated hot spot information varies between embodiments and depends on many factors, some of which are discussed in more detail with reference to FIG. **3**B. For example, other communications, such as an authorization to download files or data initiation, may occur before downloading begins in some embodiments. Alternatively or in addition, downloading may be delayed in an embodiment until a time when more bandwidth is available or when downloading will not disrupt game play.

At step **330**, the mobile communication device may designate a location in-game as associated with activating the hot spot. The location may be an item or may be unassociated with an item, depending on the embodiment. The exact timing of when the location is designated varies



depending on the embodiment. In addition, some embodiments may query whether the user wishes to implement the hot spot before the hot spot location is designated. An embodiment might also include presenting the user with a message explaining the updated hot spot information. For example, before the updated hot spot location is designated, the user might be presented with a message that states "x would like to hide a game tip in this room". In some of those embodiments, the user may have the option of accepting or declining the hot spot implementation.

At step **340**, the mobile communication device may display the content associated with the hot spot within the video game (i.e., in-game). For example, a promotional jingle may play when the user touches the bottle **232** from FIG. **2**B. The content may include a message, such as "Drink X—it is good for you!" The associated content may also be displayed in a pop-up window. Pop-up windows that are spawned from the operation of the game are considered to be in-game for the purpose of this disclosure, even if a separate website is spawned.

Turning now to FIG. **3**B, a more elaborate set of steps followed by a mobile communication device in some embodiments is presented. At step **305**, the mobile communication device may operate a video game.

Unlike in FIG. **3**A, FIG. **3**B includes intervening steps **306**, **307**, and **309** for triggering checks for hot spot information. Requests (i.e., checks) for updated hot spot information may or may not specify particular hot spot information to check for, depending on the embodiment. For example, the mobile communication device may not know what hot spot information, if any, is available when the mobile communication device contacts the server at step **310**. In some embodiments, the mobile communication device may identify a particular game, scene, and/or element for which hot spot information is desired when the mobile communication device contacts the server. In other embodiments, the mobile communication device may request updated hot spot information for several games during contact with the server at step **310**.

Some of the methods for triggering a hot spot information update will now be discussed. In some embodiments, the user may manually request updated hot spot information at step **306**. For example, the video game operating on the mobile communication device may include a selectable option to retrieve updated hot spot information. Selecting this option may cause the mobile communication device to immediately contact the server to check for content to download at step **310** in some embodiments. Alternatively, there may be further options, including retrieving updated hot spot information when the game ends or at some other time.

At step **307**, an embodiment may request updated hot spot information upon initialization of the video game. For example, when the game is selected or otherwise initialized by the user, the mobile communication device may automatically contact the server to check for hot spot information to download at step **310**. In some of embodiments with the automatic request feature, the check may not be performed automatically on every startup. For example, upon initializing the game, the mobile communication device may check how much time has passed (or how many games have been played) since the previous download before automatically contacting to the server at **310**. In those embodiments, the mobile communication device may track the dates of one or more previous updates.

In some embodiments, at step **309**, the mobile communication device may connect to the server to check for

 

updated hot spot information when the time period since the last check and/or download exceeds a threshold. As previously stated, in some embodiments step **309** is combined with step **307**. In other embodiments, the time period since the last update is checked at times other than upon initializing the game. For example, upon reaching a certain level or scene in the game, the mobile communication device may examine the last time the game, level, and/or scene was updated. If the time period exceeds a threshold, then the mobile device may contact the server at **310**. The threshold time period between updates may vary depending upon the game and the embodiment. In some embodiments, the user may be able to increase or reduce the frequency of hot spot information updates by lowering or raising the threshold period. A user with lower bandwidth limits may not want to check for updates as often as a user who has higher bandwidth limits included in their service plan.

In other embodiments, the mobile communication device may utilize a separate scheduler program to schedule a request for updated hot spot information. When the scheduled time for checking arrives, the mobile communication device may contact the server. The video game may not be operating while the request is sent in some of those embodiments. Alternatively, at the scheduled time, the mobile communication device may launch a component of the game to request updated hot spot information from the server.

At step **310**, the mobile communication device may contact the server to check for hot spot information to download. Contacting the server may be accomplished by using the network accessible by the mobile communication device in an embodiment. Some embodiments may contact the server over the Internet. In some embodiments, the server is contacted by first connecting to an interface. The interface may validate the mobile communication device as belonging to a particular service and/or confirm that the mobile communication device is configured and/or allowed to receive hot spot information, such as at step **315**.

Other embodiments may not contact the server unless the user has selected a game option that allows hot spot information updates. In some of those embodiments, if the user requests a content update at step **306**, the request may override current settings concerning whether hot spot information updates are allowed.

In some embodiments, when the mobile communication device contacts the server, the mobile communication device may send the server one or more version identification numbers for hot spot information currently on the mobile communication device. The server may use these version identification numbers to determine if the mobile communication device already has downloaded some or all of the hot spot information available for download. In those embodiments, sending the version identification number may help eliminate downloads of duplicative information.

In one embodiment, the server may use a checksum algorithm to determine whether the mobile communication device has already received the hot spot information. Any known algorithm for checking whether content has previously been downloaded, thus reducing download redundancy, may be used in an embodiment.

At step **315**, the server in some embodiments may verify whether the mobile communication device should receive hot spot information updates before sending the updated hot spot information. This preference may be stored on the server in some embodiments.

At step **312**, the mobile communication device may receive an initial message from the server. In some embodiments, this message may alert the user of available hot spot information and/or ask the user whether they wish to receive the information. For example, an embodiment may require the user to allow the updated hot spot information at step **315** in order for the updating process to continue. The initial message, presented at step **312**, may be influenced by whether the server data suggests that the mobile communication device should receive updates. For example, the initial message received at step **312** could be a message specifying that the mobile communication device is not configured to receive updated hot spot information. The initial message may also describe the features of the hot spot information to aid the user in deciding whether to download the content. In addition, the initial message may specify details about the available hot spot information, such as file size, number of files, and/or estimated download time. In some embodiments, the user may setup game parameters so that this presentation and/or authorization is bypassed.



The initial message may also include information that helps the mobile communication device to internally check what available updated hot spot information is already present on the mobile communication device. In some embodiments, this may allow the mobile device to present the user with only those new features that the mobile communication device has not already implemented.

In addition, the initial message at step **312** may be promotional in nature. For example, the message may state "X would like to hide a secret within this scene. Do you accept?" Therefore, even if the user declines the update, an embodiment may still promote the third party (e.g., X) in some embodiments. Sending a promotional initial message at step **312** may also provide the game company with a means of tracking the number of times users view promotional content. This embodiment also may allow a game company to charge the advertising third party on a per-view basis. In other words, the game company may profit for each time the promotional initial message is presented to a user at step **312**.

Continuing at step **317**, the mobile communication device may send a follow-up request to the server. The request may include whether or not the mobile communication device should receive the updated hot spot information. For example, if the mobile device determines, at step **315**, that it should not receive hot spot information, the follow-up request may alert the server to take no further action. In some embodiments, the mobile communication device may not send a follow-up request if receiving updates is disallowed. Conversely, if receiving updates is allowed, the follow-up request sent to the server at step **317** may include an indication that the updates should be sent to mobile device from the server.

In some embodiments, the follow-up request may specify which hot spot information the user wishes to download. For example, the initial message at step **312** may allow the user to select less than all of the available hot spot information for download. Additionally, the mobile communication device may already have some of the hot spot information that is available on the server, in which case the mobile communication device may not need to download that content again.

In yet another embodiment, the user may specify when to download the hot spot information. For example, the user may wish to delay the download of the hot spot information until some later time when the user is not placing calls, playing a game, or otherwise using the mobile communication device. The follow-up request may alert the server that the download may occur at some other time.

The follow-up request (or some other communication) may also allow the server to track the success of promotional messages. For instance, if a high percentage of users reject downloading of hot spot information after being presented with a particular message, the message may be ineffective.

At step **320**, the mobile communication device may download hot spot information from the server. In some embodiments, this may occur while the game is operating on the mobile communication device. In other embodiments, the mobile communication device may receive the updated at some other time. As stated previously, the user may specify when the download will occur in some embodiments.

In some embodiments, the mobile communication device may recognize certain files (of hot spot information) as already downloaded to the mobile communication device. In these embodiments, the mobile communication device may automatically bypass the repeated download of this updated information.

The server may track the number of mobile communication devices that have downloaded promotional hot spots. For example, the game company may use this information to profit from each download of a third-party advertisement. The server may also track user-identification information in conjunction, which may aid in determining whether the third-party advertiser reaches a particular demographic. Appropriate security safeguards may be implemented to make sure the information is not disclosed to unauthorized individuals.

At step **325**, a version identifier for the downloaded hot spot information may be saved. This identifier may be saved on the mobile communication device, the server, both, or neither, depending on the embodiment. Saving the identifier may help prevent against duplicative downloads. In embodiments where the server stores the version identifier, the version identifier may be stored in a database table in relation to a mobile communication device identification value. The identifier data may be stored on a storage medium such as described with reference to FIG. **1** (e.g., storage medium **130**). In one embodiment, the mobile communication device may execute a checksum algorithm on the version identifier (and/or compare the identifier to locally-stored data) to determine whether the updated hot spot associated with the version identifier has already been downloaded. Any known algorithm for checking whether content has previously been downloaded, thus reducing download redundancy, may be used in an embodiment.

Alternatively, the mobile communication device may compare available information identifiers received from the server with version identifiers on the mobile communication device, when analyzing which files to receive.

At step **328**, the mobile communication device may display the features of the downloaded hot spot information to the user. This step may be similar to the initial message step **312**, in some embodiments.

At step **330**, the mobile communication device may use coordinate information from existing or updated hot spot information to designate a location in-game for activating the particular hot spot. For example, the coordinates may specify a location along the horizontal axis of the screen and the vertical axis to monitor for user interaction. The location may define the boundaries of an object. In some embodiments, such as games with three-dimensional views, the coordinates may additionally specify a location along a depth axis. In other embodiments, the coordinates may specify a fixed location on the screen of the mobile communication device.

In some embodiments, the coordinates may also include scene, level, or time information for placing the hot spot in-game. For example, in the darts game illustrated in FIGS. **2**A-B, different hot spots may be placed on dart board **210** when the user has been playing the game for a certain amount of time or has achieved a certain score.

In still more embodiments, the coordinates comprise a selection of one or more predefined in-game locations. For example, turning back to FIG. **2**A, a first location may be the shirt **230**, a second location may be poster **225**, a third location may be dart board **210**, and so on. In that embodiment, the coordinates need only identify the pre-defined location (rather than positions along the axes) and the mobile communication device may designate that location as activating the hot spot.

In other embodiments, the hot spot information may not include coordinates. For example, the mobile communication device may have a predefined location associated with activating the hot spot.

In some embodiments, the placement location of the hot spot is determined based on user interaction. For example, the activated content of a first hot spot may include placing a second hot spot in-game.

If the hot spot information includes and/or defines an item, the item may be displayed in-game at the designated location at step **335**.

At step **337**, the mobile communication device may detect activation of a hot spot via user manipulation of the hot spot location. As previously stated, the location may be an item in some embodiments. The hot spot information may specify what type of manipulation is required to activate the hot spot. For example, the user may need to cause a particular object, such as a cursor or game element, to enter into the hot spot location. In another embodiment, if the user causes a particular in-game character to touch or otherwise manipulate the hot spot location, the hot spot may be activated.

When the hot spot is activated, content may be presented to the user at step **340**. The content may include a message (e.g., step **342**), graphics, animation, and/or sound, depending on the embodiment. The content may be displayed at a location specified in the hot spot information.

Some embodiments include an option for the user to remove in-game hot spots. Similarly, the user may be able to restore original hot spots by selecting an option within the game, or by default in some situations. In some embodiments, this is achieved by archiving previous hot spot information on the mobile communication device. In other embodiments, hot spot information may be archived on the server for download by the mobile communication device.

FIGS. **4**A-B are exemplary flow charts that include steps taken by a server to update hot spot information on a mobile communication device in accordance with an embodiment of the present invention. Turning now to FIG. **4**A, the server may store hot spot information on a computer-readable medium in some embodiments. The computer-readable medium may be the storage medium discussed with respect to FIG. **1** (e.g., storage medium **130**) in some embodiments.

At step **430**, the server may receive a request for hot spot information from the mobile communication device. This request may be an inquiry regarding a particular game, scene, and/or element within the game. In some embodiments, the request is an inquiry for hot spot information for multiple games. The request may also contain a version identifier that may help the server determine what hot spot information the mobile communication device has already downloaded.

At step **450**, the server may upload the content to the mobile communication device. The uploaded content may include coordinates, an item, and/or other content for display after the hot spot is activated.

Turning now to FIG. **4**B, a more elaborate set of steps followed by a server in some embodiments is presented. At step **410**, the server may store updated hot spot information in a storage medium. In some embodiments, the updated hot spot information is indexed in a database, such as a relational database. The storage medium may be any number of types of memory or devices, such as described above with reference to FIG. **3**B.

At step **420**, an interface may receive a request for hot spot information from a communications device. The interface may be configured differently depending on the embodiment, and as previously discussed with respect to FIG. **1**.

In some embodiments, the request may include one or more version identification numbers, as previously mentioned.

At step **425**, the interface in some embodiments may verify whether the mobile communication device should receive hot spot information before sending the hot spot information. In an embodiment, the interface verifies that the mobile communication device belongs to a particular service subscription. In another embodiment, the interface may query stored data to determine whether the mobile device is configured to receive hot spot information. If the mobile communication device is configured to receive hot spot information, the interface may pass the request to the server. In some embodiments, the server will receive the request without (or regardless of) any querying by the interface. In other embodiments, the verification is handled after the server receives the request.

The server may receive the request at step **430**. In some embodiments step **420** and **430** are combined.

At step **440**, the server may attempt to determine what hot spot information should be sent to the mobile communication device. For example, the determination may be based on the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider that provides the plan to the mobile device, the base location of the mobile device, the current location of the mobile device, which updates the mobile device has already received, user information, preset location, and/or other criteria.

In an embodiment, the server uses the base location of the mobile communication device to provide localized promotional hot spots. For example, the server may query a database of hot spot information using the area code of the mobile communication device to promote businesses that are in or near the area code. Similarly, the mobile communication device may report its current location to the server. In some of those embodiments, the hot spot information to send to the mobile communication device may include promotional content for businesses near the mobile communication device's current location.

The server may also add an element of randomness to the selection of hot spot information in some embodiments. In these embodiments, more than one promotional hot spot may be eligible for placement in a particular in-game scene or location, and the server may choose what hot spot information to send based at least partially on chance. In another similar embodiment, the server may send content to one or more mobile communication devices on a rotational basis. For example, if hot spot information A was previously sent to a mobile communication device, hot spot information



B may be sent to the next mobile communication device to contact the server. In this way, the server may take turns selecting which content to send to a mobile communication device that requests hot spot information. Alternatively, the mobile communication device may randomly select the hot spot. Additional methods of selection include the time of day, the date, and/or the level of play.

At step **450**, the hot spot information may be sent to the mobile communication device. The hot spot information may be sent immediately in some embodiments, or it may be sent at some other time. In addition, some hot spot information may be sent in different download blocks. In this way, the mobile communication device may be able to incorporate some hot spot information before receiving all of the information.

The server may also track the number of times promotional hot spots are sent, as previously mentioned.

In some embodiments, at step **460**, the mobile communication device may send a confirmation to the server indicating a successful transaction. In embodiments comprising a server that tracks what hot spot information the mobile communication device has already received, the server may not count the hot spot information as received until the confirmation is returned. In some embodiments, the server receives confirmation when the last of the date is transferred to the mobile communication device.

Other embodiments of the invention will be apparent to those skilled in the art from consideration of the specification and practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with a true scope and spirit of the invention being indicated by the following claims.

What is claimed is:

**1**. A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:

a) contacting a server for hot spot information to download, comprising providing the server with at least one of: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, a version identifier for hot spot information currently on the mobile communication device, user-identification information, preset location, amount of game-play time, game score, and level of play;

b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:

 1) hidden content for presenting to the user when the hot spot is activated; and

 2) coordinate information;

c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;

d) displaying an object at the designated non-promotional location; and

e) displaying the hidden content when the user activates the hot spot.

**2**. The method of claim **1**, wherein the hidden content is promotional.

3. The method of claim 1, wherein the coordinate information comprises time information for placing the hot spot in-game.

4. The method of claim 1, wherein the coordinate information comprises one or more predefined in-game locations.

5. The method of claim 1, wherein the hot spot information further comprises an object to be displayed in-game at the non-promotional location.

6. The method of claim 1, wherein the hot spot information specifies a type of manipulation required to activate the hot spot.

7. The method of claim 1, further comprising saving on the mobile communication device a version identifier for the downloaded hot spot information.

8. The method of claim 1, wherein the hidden content comprises one or more objects selected from the group consisting of messages, graphics, animations, and sounds.

9. The method of claim 8, wherein the hidden content is promotional.

10. The method of claim 1, wherein the hidden content is displayed in a pop-up window.

11. The method of claim 1, wherein the hidden content is displayed on the mobile communication device in a website separate from the video game.

12. The method of claim 1, wherein the hidden content comprises a second hot spot.

13. A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:

a) contacting a server for hot spot information to download, comprising providing the server with user-identification information;



b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:

1) hidden promotional content for presenting to the user when the hot spot is activated; and

2) coordinate information;

c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;

d) displaying an object at the designated non-promotional location; and

e) displaying the hidden promotional content when the user activates the hot spot.

14. The method of claim 13, wherein the hidden content is promotional.

15. The method of claim 13, wherein the coordinate information comprises time information for placing the hot spot in-game.

16. The method of claim 13, wherein the hot spot information further comprises an object to be displayed in-game at the non-promotional location.

17. The method of claim 13, wherein the hot spot information specifies a type of manipulation required to activate the hot spot.

18. The method of claim 13, wherein the hidden content comprises one or more objects selected from the group consisting of messages, graphics, animations, and sounds.

19. The method of claim 13, wherein the hidden content is displayed in a pop-up window.

20. The method of claim 13, wherein the hidden content comprises a second hot spot.

* * * * *